870 A.2d 679 (2005)
376 N.J. Super. 364
John VARGO, Plaintiff-Appellant,
v.
NATIONAL EXCHANGE CARRIERS ASSOCIATION, INC., and Laboratory Corporation of America, Defendants-Respondents, and
Accountants on Call, Inc., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2005.
Decided April 12, 2005.
*680 Christopher P. Kelly, Basking Ridge, argued the cause for appellant (Reppert Kelly, attorneys; Mr. Kelly, on the brief).
Richard S. Zackin, Newark, argued the cause for respondent National Exchange Carriers Association (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Zackin, on the brief).
Demetrios C. Batsides, Newark, argued the cause for respondent Laboratory Corporation of America (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Batsides and Mara E. Zazzalli-Hogan, on the brief).
*681 Before Judges NEWMAN, AXELRAD and HOLSTON, JR.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
Plaintiff, John Vargo, appeals the January 28, 2004 order memorializing Judge Dumont's written opinion granting summary judgment in favor of defendants, National Exchange Carriers Association, Inc. (NECA) and Laboratory Corporation of America (LabCorp), dismissing plaintiff's nine-count amended complaint.
Plaintiff alleges: (1) invasion of his right to privacy, in violation of the common law and the state constitution (against NECA); (2) negligence (against NECA); (3) wrongful refusal to hire in violation of public policy (against NECA); (4) wrongful discharge in violation of public policy (against NECA and Accountants on Call, Inc. (AOC)); (5) discriminatory refusal to hire based upon disability or perceived disability, in violation of the New Jersey Law Against Discrimination (NJLAD) N.J.S.A. 10:5-1 to -49 (against NECA); (6) discriminatory discharge based upon disability or perceived disability, in violation of the NJLAD (against NECA and AOC); (7) retaliatory discharge in response to plaintiff's expressed intent to sue NECA for violating his civil rights, in violation of the NJLAD (against NECA and AOC); (8) tortious interference with prospective economic advantage (against NECA); and (9) negligence (against LabCorp).
NECA is a not-for-profit corporation that assists telephone companies in fulfilling the responsibilities and obligations imposed upon them by the Federal Communications Commission (FCC) by providing operational services to implement "universal service support programs" such as the "School and Libraries Program" and the "Rural Healthcare Program." These programs allow schools, libraries and rural healthcare providers to receive discounts on advanced telecommunications and information services.
For approximately eighteen months, between January 2000 and June 2001, plaintiff worked at NECA through AOC, a temporary agency through which he was compensated as a Program Integrity Assurer in the company's Schools and Libraries Division, reviewing applications from school and libraries to determine their eligibility for monetary grants.
In May 2001, plaintiff's direct supervisor at NECA, John Carey, advised plaintiff of an opening for a permanent position in NECA's Rural Healthcare Division. Plaintiff knew that it was NECA's policy to require all applicants for permanent positions to submit to a drug test and that passing the drug test was a condition of employment. Plaintiff informed Carey that he was taking certain legally-prescribed medications for degenerative disc disease that might show up on a drug test. Carey advised plaintiff to be "forthright" and inform everybody "upfront" about the medications he was taking.
On May 21, 2001, plaintiff was offered the position by Cathy Post, an associate manager of staffing in NECA's human resources department, contingent upon his passing a drug test scheduled for three o'clock that afternoon at Morristown Memorial Hospital. Plaintiff did not object to taking the drug test. NECA's drug testing policy was printed on the employment application plaintiff had completed and signed under the heading "Terms and Conditions of Employment."
NECA has had a drug-free workplace policy since the early 1990s, which originally applied only to applicants for permanent employment and not temporary employees. However, as the number of *682 temporary employees increased over the years, NECA reconsidered that practice and presently requires all temporary and permanent employees to undergo a pre-employment drug test.
On the morning of May 21, 2001 after he received the offer of employment, plaintiff met with Carey and discussed the drug test, including the fact that he had eaten a poppy seed bagel for breakfast that morning. Carey advised plaintiff to disclose that fact to the screener because poppy seed bagels could show up on plaintiff's drug screen.
Before he left for the drug test, plaintiff met with Post to obtain the drug testing paperwork and provided her with a note from one of his physicians, disclosing that he was taking prescription medication that might show up on his drug screen. Post advised plaintiff that NECA did not need to know about his prescriptions unless the drug test came back positive, but she advised him to provide such information to the person administering the test.
When plaintiff arrived at Morristown Memorial Hospital, he proceeded to the emergency room where he met with the male nurse who was to take his urine specimen. Plaintiff advised the nurse of his prescription medications and also volunteered that he had eaten a poppy seed bagel for breakfast that morning. The nurse handed plaintiff a sealed bag containing a sample cup. He then left plaintiff alone to provide the urine sample in a private bathroom.
The sample was sent to LabCorp, an independent clinical laboratory, for analysis. NECA contracted with LabCorp to perform its drug screens and relied upon LabCorp to provide it with accurate test results.
LabCorp tested plaintiff's urine sample for drugs of abuse, including amphetamines, cannabinoids, cocaine, and opiates (codeine and morphine). Testing consisted of an initial immunoassay screen followed by a confirmatory screen using gas chromatography/mass spectrometry, which is considered the "gold standard" in the laboratory testing industry.
When analyzing samples for NECA, LabCorp has used a cutoff level of 300 nanograms per milliliter (ng/ml) for detecting opiates, meaning that any reading greater than 300 ng/ml was considered "positive" for opiates. The 300 ng/ml cutoff was standard in the industry when NECA entered into its contract with LabCorp and was the only cutoff used for opiate detection.
In 1998, the United States Department of Transportation (DOT) raised its cutoff for opiate detection from 300 ng/ml to 2000 ng/ml in order to reduce the possibility of positive results caused by innocent activity, such as the ingestion of food products containing poppy seeds. However, notwithstanding the DOT's change in its cutoff level, the majority of LabCorp's tests including those performed for NECA in 2001 continued to use a 300 ng/ml cutoff level for opiates since private industry clients were not required to follow the DOT guidelines.
Plaintiff's expert, Dr. Richard Saferstein, offered his personal opinion that LabCorp should have advised its clients that use of the 300 ng/ml cutoff could cause a positive reading as a result of innocent ingestion of certain food products and that use of a 2000 ng/ml cutoff was more appropriate than a 300 ng/ml cutoff. However, Saferstein was not aware of any standard of professional laboratory practice that required laboratories to inform their clients of the complications associated with using a 300 ng/ml cutoff nor was there a deviation from the standard *683 of professional laboratory practice in using a 300 ng/ml cutoff.
The tests results indicated that plaintiff had tested positive for morphine at a level of 822 ng/ml. Saferstein did not dispute the accuracy of the test results nor did he contend that the testing was done improperly. Saferstein admitted that the test results could have been caused by plaintiff's use of heroin or morphine, but he opined that the results could also have been caused by the ingestion of a food product containing trace quantities of morphine.
Saferstein stated that a test, also not mandated as a standard of laboratory practice, could have been run for thebaine, a substance present in poppy seeds, which might have indicated whether plaintiff's positive test result was the product of poppy seed ingestion as opposed to drug use.
Post advised plaintiff that he had failed the drug test but, per company policy, could not reveal what plaintiff tested positive for because applicants could research possible innocent causes of positive results and then present false information to the company as an explanation for their positive test results. Therefore, NECA preferred to ask applicants to state what they thought might have caused the positive result. Consistent with that procedure, in e-mails dated May 24 and 25, 2001, after he had been informed of his positive test result, plaintiff advised Post that he was taking Percocet as prescribed by his doctor and that his doctor was available for consultation.
After the retest of plaintiff's urine sample came back positive, at NECA's request, Lucy Smith, NECA's manager of staffing, spoke with plaintiff as to whether he could provide any information as to why he had failed the test, including whether he was taking any medications that he believed might have caused the positive result. Smith told plaintiff that, if he provided NECA with a list of the prescribed medications he had been taking at the time of the drug screen, she could provide that information to the lab to determine if any of the medications could have caused his positive result. Plaintiff told Smith that he could provide a list of his medications.
Plaintiff mentioned to Smith that he had eaten a poppy seed bagel on the morning of his drug test. Smith admitted that plaintiff had made this statement to her, but she believed plaintiff was joking and not serious.
On June 4, 2001, plaintiff met with Post and Louise Kiernan, NECA's manager for staff development and training, and provided them with documentation from his pharmacy identifying the medications he had taken in the two weeks prior to his drug test. They were Prilosec, Hydrocodone, Acetaminophen, Percocet, and Roxicet. Plaintiff also showed Post and Kiernan his prescription bottles for Zoloft and Lotrel. Kiernan made a photocopy of the pharmacy's documentation but failed to document the Zoloft and Lotrel, believing incorrectly that it was referenced on the pharmacy's printout.
Shortly after this meeting, Kiernan spoke with Michael Bachman of LabCorp and provided him with the list of plaintiff's prescriptions. Bachman informed Kiernan that none of plaintiff's medications would have caused him to test positive for morphine.
On June 5, 2001, plaintiff e-mailed Kiernan and asked whether she had recorded the medications from the prescription bottles he brought to the June 4 meeting. Kiernan admitted she had not done so but stated that plaintiff was welcome to bring the bottles back to NECA so that Kiernan could record the medications and dates *684 and then contact LabCorp with the updated information.
On June 5, 2001, Post telephoned plaintiff and informed him that LabCorp officials did not believe that his prescription medications would have caused his positive test results and that as a result of the failed drug test, NECA was withdrawing its offer of employment. Post explained that plaintiff had the option of having his urine sample retested a third time, at his own cost. Plaintiff again asked Post for what he had tested positive. However, pursuant to NECA's policy, Post did not disclose that information.
Later that day, plaintiff provided Post with a letter from his then-attorney, John Celentano. Celentano requested that NECA provide additional information about plaintiff's positive drug screen, including information about the drug for which plaintiff had tested positive, so that plaintiff could have an independent analysis performed to determine whether the positive reading was caused by plaintiff's prescribed medications. Celentano also requested that plaintiff be permitted to retake the drug test. Post gave the attorney's letter to Cascille Reiner, NECA's executive director of human resources. During this face-to-face meeting, Post told plaintiff that NECA had decided to pay for the retest of plaintiff's urine sample since the test results would remain confidential.
On June 5, 2001, according to plaintiff, there was some discussion of his future at NECA, at which time Post informed him that he could continue in his current temporary position at NECA through AOC. Post denied making such a statement. On June 6 or 7, 2001, plaintiff e-mailed Kiernan and advised her that he had his medicine bottles with him at NECA and that he had documentation from his doctor and hospital regarding injections he had received between January and April 2001.
Kiernan arranged to meet with plaintiff that afternoon to clarify whether plaintiff had ingested any food or drug that might have caused his positive test results. However, before the meeting started, Post and Kiernan were advised by Reiner, who had been advised by NECA's legal department, to decline to accept any supplemental information regarding plaintiff's prescription medications and to advise plaintiff that his sample was being tested for a third time, and to reiterate that, if the retest came back positive, NECA's decision to withdraw its employment offer would be final.
At the meeting, Post and Kiernan advised plaintiff in accordance with Reiner's instructions. According to plaintiff, Kiernan informed him that his urine sample had revealed the presence of "psychotropic medication," which plaintiff understood to mean the Zoloft he was taking. Plaintiff contends he asked Kiernan to clarify whether it was NECA's policy not to hire someone who failed a drug test because they were taking legally-prescribed psychotropic medication, and Kiernan responded in the affirmative. Kiernan denies making the statement. Plaintiff believed NECA did not want to employ him because of all the legally-prescribed medications he was taking, including psychotropic medications, which formed the basis for his disability/perceived disability discrimination claims under the NJLAD.
Plaintiff became upset at the meeting and, as he left, he remarked: "I don't know if you know who Norman Siegel is . . . but you may be getting to know him very well soon."[1] Post and Kiernan did not know who Norman Siegel was, but *685 they understood plaintiff's remark to mean that plaintiff intended to sue NECA. On June 7, 2001, Kiernan and Post learned from LabCorp that the retest of plaintiff's sample had yielded a positive result for morphine. Kiernan, with Post present, telephoned LabCorp and spoke with Dr. William Wingert, the toxicologist who had been processing plaintiff's tests, to confirm that none of plaintiff's medications would have caused the positive result. Kiernan also asked Wingert whether eating a poppy seed bagel could have caused the positive result. Wingert responded that this was a possibility, but he stated that the positive result could also have resulted from codeine or heroin use and that there was no way to definitively determine the source.
Later that evening, after consulting with NECA's legal department, Reiner instructed Kiernan and Post to terminate Vargo's temporary employment with NECA by contacting AOC, and Post did as she was instructed. On June 7, 2001, AOC advised plaintiff that his temporary assignment with NECA was being terminated based upon his positive drug test result. Thereafter, on June 8, 2001, Regina McNeill, an attorney employed by NECA, responded to the letter from Celentano, stating that NECA was "under no legal obligation to furnish Mr. Vargo with information regarding his previous test nor to provide him the opportunity to be retested."
Plaintiff presents the following arguments for our consideration:
POINT I
THE LOWER COURT FAILED TO DRAW LEGITIMATE INFERENCES IN FAVOR OF PLAINTIFF WHICH WERE SUFFICIENT TO CREATE A GENUINE ISSUE OF MATERIAL FACT AS TO PLAINTIFF'S DISPARATE TREATMENT CLAIMS UNDER THE LAW AGAINST DISCRIMINATION.
A. SUMMARY JUDGMENT STANDARD.
B. THERE IS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD FOR A RATIONAL JURY TO CONCLUDE THAT NECA'S TRUE MOTIVATION FOR WITHDRAWING PLAINTIFF'S OFFER OF EMPLOYMENT AND TERMINATING HIM FROM HIS CURRENT POSITION WAS BECAUSE IT PERCEIVED HIM TO BE DEPENDENT UPON PRESCRIPTION DRUGS OR SUFFERING FROM A DISABLING CONDITION.
C. NECA'S ADVERSE EMPLOYMENT ACTIONS AGAINST PLAINTIFF BASED ON AN ERRONEOUS BELIEF THAT HE WAS A USER OF ILLEGAL DRUGS CONSTITUTES A VIOLATION OF THE LAW AGAINST DISCRIMINATION.
POINT II
THE EVIDENCE OF RECORD WAS MORE THAN SUFFICIENT TO WITHSTAND NECA'S MOTION FOR SUMMARY JUDGMENT ON HIS CLAIM OF UNLAWFUL RETALIATION UNDER THE LAD.
POINT III
NECA'S DRUG TESTING POLICY AND PRACTICE IS A VIOLATION OF A CLEAR MANDATE OF PUBLIC POLICY AND ITS ADVERSE EMPLOYMENT ACTIONS AGAINST PLAINTIFF BASED ON THE RESULTS OF HIS DRUG TEST WERE WRONGFUL.
A. THE NEW JERSEY SUPREME COURT HAS EXPRESSLY HELD THAT EXISTING CONSTITUTIONAL AND COMMON LAW PRIVACY PROTECTIONS MAY FORM *686 THE BASIS FOR A CLEAR MANDATE OF PUBLIC POLICY SUPPORTING A WRONGFUL DISCHARGE CLAIM IN THE CONTEXT OF EMPLOYMENT DRUG TESTING.
B. VARGO'S INDIVIDUAL PRIVACY INTERESTS CLEARLY OUTWEIGH THE COMPETING INTEREST IN PUBLIC SAFETY INASMUCH AS HIS POSITION AT NECA WAS NOT OF A SAFETY-SENSITIVE NATURE.
POINT IV
THERE IS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD TO SHOW THAT NECA'S DRUG TESTING POLICY AND PRACTICE VIOLATED PLAINTIFF'S COMMON LAW RIGHT TO PRIVACY.
POINT V
THE ACTIONS OF NECA AND LABCORP IN FAILING TO PROPERLY ADMINISTER AND INTERPRET PLAINTIFF'S DRUG SCREEN CONSTITUTES NEGLIGENCE.
Judge Dumont granted defendant's summary judgment in an extensive written opinion. The judge addressed the counts alleging that NECA's mandatory pre-employment drug testing policy invaded plaintiff's privacy and public policy in violation of the common law and the New Jersey Constitution. The court noted that the Supreme Court in Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 98, 609 A.2d 11 (1992), specifically found no constitutional right to privacy that governs the conduct of private employers. The court also quoted favorably from Jevic v. Coca Cola Bottling Co. of N.Y., Inc., No. CIV.A.89-4431, 1990 WL 109851, at *9 (D.N.J. June 6, 1990), where the U.S. District Court determined that, absent statutory regulations circumscribing drug testing as an invidious intrusion into one's affairs, there was no constitutional proscription to a private employer's drug testing policy. The judge in that case determined that whether there is a common law violation requires a court to balance the employer's interest with the prospective employee's reasonable expectation of privacy. Id. at *1.
Here, the judge, in finding no invasion of plaintiff's expectation of privacy, determined that a waiver on the part of the prospective employee to undergo a test negates an invasion of privacy claim. The court pointed out the following facts evidencing that plaintiff had no reasonable expectation of privacy. NECA had a long-standing drug-free workplace policy and pre-employment drug screening policy for all applicants for permanent positions. Plaintiff knew of the policy when he signed the "Terms and Conditions of Employment." Plaintiff voluntarily informed Post of the medications he was taking and voluntarily submitted to the non-intrusive drug test in a private bathroom at the hospital. Plaintiff volunteered personal medical information from the outset of the drug screening process and, after the positive results were known, plaintiff presented his medication list to the NECA employees involved in the hiring and testing process.
As to plaintiff's counts alleging that NECA's decision to refuse to hire him and to terminate him from his temporary position violates "a clear mandate of public policy," the court determined that, pursuant to Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980), plaintiff had failed to identify a specific expression of public policy that precluded NECA the right to discharge him with or without cause. Sources of public policy include the constitution, statutes, administrative rules, regulations and judicial decisions. A "clear mandate" exists when the public policy is "one that on balance is beneficial *687 to the public." Hennessey, supra, 129 N.J. at 100, 609 A.2d 11. The judge reasoned that, although Hennessey involved an employee who was in a safety-sensitive position whereas plaintiff was applying for a non-safety-sensitive administrative position, Hennessey did not proscribe mandatory pre-employment drug testing of all applicants. The Court in Hennessey recognized that "The Legislature has defined the limits of other forms of [drug] testing . . . . and can more fully define the contours of the competing rights of employers and employees" but, thus far, has not done so. Id. at 107, 609 A.2d 11 (citation omitted).[2]
The court addressed plaintiff's count alleging negligence as requiring the breach of a duty owed. The court found the allegation that the drug screening policy was administered in a discriminatory and unreasonable manner lacked merit because all applicants for permanent employment with NECA were required to submit and pass a drug test as a condition of being offered a permanent position.
As to the claim of negligence in failing to ensure safeguards in the accuracy of the findings, the judge noted that NECA contracted with LabCorp to have the laboratory independently perform all testing and that pursuant to Majestic Realty Assocs., Inc. v. Toti Contracting Co., 30 N.J. 425, 430-31, 153 A.2d 321 (1959), plaintiff had failed to demonstrate one of the three circumstances, where as a principal, NECA could be held vicariously liable for LabCorp's negligence in analyzing his urine sample.
The judge also addressed plaintiff's allegation that NECA wrongfully refused to hire him as a permanent employee in the Rural Healthcare Division and wrongfully discharged him from his temporary position in the Schools and Library Division in violation of the NJLAD because NECA's decisions were based on its perception that he was suffering from a disability. The judge assumed, for purposes of his analysis, that the factors enumerated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L. Ed.2d 668 (1973), made out a required prima facie case. The court determined, however, that in light of NECA's drug-free workplace policy and plaintiff's inability to pass his drug test after three lab tests of his urine sample, NECA had met its burden of articulating a legitimate non-discriminatory reason for its decision.
The judge addressed plaintiff's claim that NECA's articulated reason is pretextual and a "cover-up" for the fact that NECA does not wish to hire someone with a dependency on six different prescription drugs, especially since some of the drugs, including Zoloft, were for the treatment of a psychiatric condition. The judge determined that the record was devoid of any evidence that NECA applied its drug-free workplace policy in a selective manner or that it would have ignored plaintiff's three *688 positive test results if it had not learned about plaintiff's prescription medications. Additionally, Kiernan gave plaintiff the benefit of the doubt by asking Dr. Wingert from LabCorp if the positive morphine result could have been from the ingestion of a poppy seed bagel. The judge determined that upon confirming that plaintiff may or may not have been an illegal drug user, NECA was entitled to make the business decision not to hire plaintiff for permanent employment and to fire him from his temporary employment.
The judge addressed plaintiff's allegation that NECA unlawfully terminated him from his temporary position "in retaliation for his expressed intention to assert his oral rights" in violation of the NJLAD. Plaintiff claims that after hearing Kiernan's alleged statement that it was NECA's policy not to hire anyone who was taking a legally-prescribed psychotropic drug. He stated, "I don't know if you know who Norman Siegel is . . . but you may be getting to know him very well soon." Prior to making that statement, plaintiff claims he was led to believe that his current position was secure regardless of whether or not he passed the drug screen. It was only one day after plaintiff mentioned Siegel's name that NECA terminated him from his temporary job. The judge determined that even if Post understood plaintiff's mention of Siegel's name to mean that he intended to sue NECA, there was a failure of proof that NECA's policy of terminating someone who tests positive for morphine constitutes unlawful discrimination in violation of the NJLAD. The judge stated that, even assuming plaintiff had made out a prima facie case and NECA articulated a non-discriminatory reason for firing in accordance with its drug-free workplace policy, plaintiff's claim fails because he failed to produce any evidence that NECA's articulated reason for his firing was pretextual. Plaintiff is unable to demonstrate that if he had not mentioned Norman Siegel's name that NECA would have overlooked his positive drug results and kept him on as a temporary employee.
The judge also found that plaintiff has not pled a viable cause of action for tortious interference with prospective economic advantage because the claim was directed solely against NECA. The judge determined that, as a matter of law, such a claim must be directed against defendants who are not parties to the economic relationship. Printing Mart  Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989).
Plaintiff also alleges counts of negligence against both LabCorp and NECA. The allegation against LabCorp is that it had a duty to advise NECA of the pitfalls of using the 300 ng/ml standard and that when using that standard, plaintiff's 822 ng/ml reading was equally possible to be from ingesting poppy seeds. Plaintiff also claims that LabCorp had an obligation to advise NECA that the DOT had increased its cutoff level for opiates from 300 ng/ml to 2000 ng/ml even though NECA was a private employer. The court determined that plaintiff was unable to prove his cause of action against LabCorp on general negligence principles alone but needed expert testimony because the allegations against LabCorp was "so esoteric that jurors of common judgment and experience cannot form a valid judgment at to whether the conduct of the party was reasonable." Butler v. Acme Markets, Inc., 89 N.J. 270, 283, 445 A.2d 1141 (1982). The court concluded that Dr. Saferstein's testimony did not opine that the 300 ng/ml cutoff NECA used for detecting opiates constituted a breach of accepted standards of laboratory practice and that Saferstein's statements to that effect constituted only a personal *689 opinion that LabCorp should have advised NECA of the possibility of plaintiff's reading as being a false positive. The judge additionallydetermined that there was no testimony of the breach of duty owed by failing to advise NECA of the DOT's policy of raising its cutoff levels. There was also no expert testimony of a breach of the standard of care by LabCorp's failure to conduct an additional test to look for the presence of thebaine.
As to allegations of negligence against NECA, the court found plaintiff's allegation that NECA failed to follow generally accepted guidelines when it used the 300 ng/ml cutoff for opiates to be unsupported by Dr. Saferstein's testimony. The judge determined that NECA's business decision to resolve the disputed possibility that the positive test results for morphine might as likely be the result of drug ingestion as from the ingestion of poppy seeds against plaintiff does not constitute negligence. The judge also found that the allegation that NECA negligently failed to record the prescription medications he was taking and the food he was ingesting prior to the drug test lacked merit.
Research has revealed only three reported cases, all outside New Jersey, involving allegations that positive laboratory urine testing for morphine was the result of poppy seed ingestion. In Caputo v. Compuchem Labs., Inc., No. CIV.A.92-6123, 1994 WL 100084, at *1 (E.D.Pa.), aff'd, 37 F.3d 1485 (3d Cir.1994), cert. denied, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), the plaintiff was denied employment with Air Products and Chemicals, Inc., based upon his failure of a pre-employment drug screen. His urine sample had tested positive for morphine. Ibid. The case involved the plaintiff's claims of negligence and defamation, asserted against the laboratory that performed the testing. Ibid.
In Caputo, there was no dispute that the report by the laboratory was accurate in the sense that the test did show evidence of morphine. Ibid. However, the plaintiff contended that the indication of morphine was so weak that the laboratory should have reported the test result as negative, absent an additional and more sophisticated test. Ibid. The basis for the plaintiff's contention was that common foods, such as poppy seed rolls, ingested prior to a drug test, can cause some level of morphine to appear in the sample and that the level of morphine caused by poppy seed ingestion can exceed the amount which the laboratory reported as a positive result of the plaintiff's drug test. Ibid.
The court dismissed the claims on the laboratory's motion for summary judgment, holding that no liability should be imposed on the laboratory for accurately reporting a positive drug test result. Id. at *3. In this regard, the court found no duty on the part of the laboratory to inform the employer (Air Products) that the low positive number generated by the plaintiff's test could have been attributable to causes other than illicit drug use. Id. at *3-4.
In SmithKline Beecham Corp. v. Doe, 903 S.W.2d 347 (Tex.1995), the court addressed the responsibility laboratories owe when testing samples provided by individuals who are being drug tested by their employers. The plaintiff had undergone a pre-employment drug screen that revealed the presence of opiates in her urine. Id. at 348. As a result, her job offer was withdrawn. Ibid. The plaintiff's claim was not that the test was performed improperly or that the result was incorrect, but that the result was due to her having eaten poppy seeds and not to any use of drugs. Ibid. She alleged that the testing laboratory should have informed her and her prospective employer that eating poppy seeds *690 could cause a positive test result, that they should have inquired as to whether she had eaten poppy seeds, and that they should have returned her urine sample to her. Ibid. The court rejected the claim, holding that independent drug testing laboratories, hired by an employer to test prospective employees for drugs, do not have a duty to tell the persons being tested that the ingestion of certain substances will cause a positive test result. Id. at 348, 350-56.
Finally, Devine v. Roche Biomedical Labs., 659 A.2d 868 (Me.1995), involved claims against the laboratory that tested a urine sample provided pursuant to a pre-employment drug testing program. The plaintiff's urine sample had tested positive for opiates, and, as a result, the employer revoked its offer of employment. Id. at 869. The plaintiff informed the employer that the results may have been caused by his daily consumption of poppy seed muffins. Ibid. However, the laboratory informed the employer that the results were too high to suggest such a source. Ibid. Therefore, the employer did not change its decision with respect to the plaintiff's employment. Ibid. The court dismissed the plaintiff's claim against the laboratory, holding that the plaintiff was not a third party beneficiary of the contract between the employer and the laboratory. Id. at 870-71.
We have thoroughly reviewed the record in light of the issues presented on appeal. We affirm the January 28, 2004 order granting summary judgment substantially for the reason expressed by Judge Dumont in his well-written and well-reasoned opinion of January 28, 2004. We add only the following with respect to the NJLAD claims: We note that the Americans With Disabilities Act (ADA) protects individuals who are "erroneously regarded" as engaging in the use of illegal drugs. 42 U.S.C.A. § 12114(b)(3); 29 C.F.R. § 1630.3(b)(3). Plaintiff in this case contends he was "erroneously regarded" as engaging in the use of illegal drugs.
The NJLAD contains no language comparable to that of the ADA. However, even were we to incorporate such protection under the NJLAD, we are satisfied that, under the circumstances presented in this case, where an employer was presented with a positive drug test result for a prospective employee, there was nothing improper or unlawful in the employer's perceiving the prospective employee as a user of illegal drugs.
The United States Supreme Court has also addressed the application of facially neutral, non-discriminatory employment policies in Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S.Ct. 513, 157 L. Ed.2d 357 (2003). There, the plaintiff had been fired by Raytheon for violating workplace conduct rules (failing a drug test). After his discharge, the plaintiff got sober and reapplied for work. Id. at 47, 124 S.Ct. at 516. However, the company denied him reemployment based upon its policy against rehiring employees who had been fired for violating workplace conduct rules (no-rehire policy). Ibid.
The plaintiff sued under the ADA contending that he had been discriminated against based upon his disability (past drug addiction). Id. at 48, 124 S.Ct. at 516. The District Court dismissed the claim on summary judgment. Id. at 49, 124 S.Ct. at 517. However, the Ninth Circuit reversed, holding that the no-rehire policy, although non-discriminatory on its face, was unlawful as applied because it had the potential to discriminate against employees who were lawfully forced to resign for illegal drug use but have since been rehabilitated. Id. at 50, 124 S.Ct. at 518.
*691 The U.S. Supreme Court reversed, holding that the Ninth Circuit had erred by applying a disparate impact theory in the context of a disparate treatment case. Id. at 53-54, 124 S.Ct. at 520. In doing so, the Court stated, in pertinent part:
[T]he Court of Appeals ignored the fact that petitioner's no-rehire policy is a quintessential legitimate, nondiscriminatory reason for refusing to rehire an employee who was terminated for violating workplace conduct rules. If petitioner did indeed apply a neutral, generally applicable no-rehire policy in rejecting respondent's application, petitioner's decision not to rehire respondent can, in no way, be said to have been motivated by respondent's disability.

[Id. at 54-55, 124 S.Ct. at 520 (emphasis added).]
Affirmed.
NOTES
[1] Norman Siegel was the head of the American Civil Liberties Union in New York.
[2] Justice Pollock, in his concurring opinion in Hennessey, made the following observation:

Evaluation of the issue of random drug testing inevitably compels balancing the interests of the employee and the employer. From an employer's perspective, an employee's use of illegal drugs presents multiple problems. For example, the use of illegal drugs can affect an employee's performance, see Craig Zwerling, et al., The Efficacy of Preemployment Drug Screening for Marijuana and Cocaine in Predicting Employment Outcome, 264 JAMA 2639 (1990) (positive pre-employment drug tests for marijuana or cocaine associated with adverse employment outcomes), endanger co-workers, and increase health-care costs.
[Hennessey, supra, 129 N.J. at 113-14, 609 A.2d 11 (Pollock, J. concurring).] The employer's policy here coincides with sound public policy.