(205 P.3d 745)
No. 99,953

JUDITH BERRY, *Appellant*, v. NATIONAL MEDICAL SERVICES, INC., d/b/a NMS LABS, and COMPASS VISION, INC., *Appellees*.

Opinion filed April 3, 2009.

*Jason M. Hans*, of Rouse Hendricks German May PC, of Kansas City, Missouri, for appellant.

*Matthew M. Merrill*, of Brown & Dunn PC, of Kansas City, Missouri, for appellee National Medical Services, Inc., d/b/a NMS Labs.

*William M. Modrcin*, of Stinson Morrison Hecker LLP, of Kansas City, Missouri, for appellee Compass Vision, Inc.

Before McANANY, P.J., BUSER and STANDRIDGE, JJ.

McANANY, J.: This case comes to us following the district court's dismissal of plaintiff's amended petition for failure to state an actionable claim for either negligence or violation of the Kansas Consumer Protection Act. Resolution of the negligence claim turns on whether the defendants owed a duty to plaintiff under the facts alleged. Resolution of the Kansas Consumer Protection Act claim turns on whether plaintiff's claim is barred either because the action was not commenced within the period of the applicable statute of limitations or because plaintiff was not a party to any consumer transaction.

Kansas is a notice-pleading state. As a general rule, a petition need contain only "(1) [a] short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief to which the pleader deems such pleader's self entitled." K.S.A. 60-208(a). A legal theory for relief need not be detailed, so long as the petition apprises the defendant of the facts upon which the plaintiff claims to be entitled to relief. *Febert v. Upland Mutual Ins. Co.*, 222 Kan. 197, 199, 563 P.2d 467 (1977). In considering a motion to dismiss for failure to state a claim upon which relief can be granted, we must assume all factual allegations in the amended petition are true and draw all reasonable inferences in favor of the plaintiff to determine if it states an actionable claim on any possible theory. See *Nungesser v. Bryant*, 283 Kan. 550, 559, 153 P.3d 1277 (2007); *Halley v. Barnabe*, 271 Kan. 652, 656, 24 P.3d 140 (2001). Plaintiff asserts the following which we assume to be true for the purpose of our analysis:

The plaintiff, Judith Berry, was a registered nurse licensed to practice her profession by the Kansas State Board of Nursing (Board). Berry admitted to the Board that she had a problem with alcohol dependency. Accordingly, in August 2003 she agreed to participate in the Board's Kansas Nurses Assistance Program (KNAP) pursuant to which she agreed to refrain from consuming alcoholic beverages and to submit to random testing to confirm her abstinence.

The Board contracted with defendant Compass Vision, Inc. (Compass), to serve as the third-party administrator of KNAP's

alcohol testing program. In turn, Compass engaged defendant National Medical Services, Inc. (NMS), to provide alcohol testing for nurses in KNAP and to report its test results to the Board.

Ethyl glucuronide (EtG) is a metabolite of alcohol. The presence of EtG in urine reportedly provides proof of prior alcohol consumption, even after the alcohol itself has been eliminated from the body. Compass and NMS were leading proponents of EtG testing and touted EtG testing as the "gold standard." Compass and NMS established 250 ng/ml (nanograms per milliliter) as the threshold for a "positive" test result. In other words, the presence of more than 250 ng/ml of EtG in a urine sample was reported to the Board as positive for the test subject having consumed alcohol. Further, Compass claimed that any EtG test result over 500 ng/ml conclusively proved intentional consumption of an alcoholic beverage by the test subject.

Published scientific literature as early as March 2004 disclosed that many ordinary products, including hand sanitizers used in hospitals throughout the country, contain ethanol, the use of which could result in positive EtG test results. Notwithstanding this information, the defendants continued to promote as valid and reliable their EtG test with its 250 ng/ml threshold for a positive result.

In January 2005, and again in June 2005, Berry submitted to random urinalyses and provided samples that were collected by Compass and analyzed by NMS. The test results for both samples were positive for Berry having consumed alcohol in violation of her KNAP agreement. Berry denies having consumed any alcoholic beverage that would account for the positive test results. In August 2005, the Board revoked Berry's nursing license.

In this action Berry claims Compass and NMS were negligent in a number of respects, including in designing, implementing, promoting, and managing their EtG testing protocol. Among the various specific grounds for negligence, she asserts that Compass and NMS were negligent in "[e]stablishing cutoffs over which test results would be reported as 'positive' that were arbitrary and scientifically unreliable and invalid." Further, Compass and NMS knew that because Berry was a participant in KNAP, her license to practice nursing would be in jeopardy if she tested positive.

Berry also claims the conduct of Compass and NMS constitutes deceptive acts and practices contrary to K.S.A. 50-626 of the Kansas Consumer Protection Act (Act).

The district court, without analysis or explanation, sustained the defendants' motions to dismiss.

### Negligence Claim

In her negligence claim Berry does not assert that EtG is an inaccurate indicator for alcohol or that the defendants mishandled or misanalyzed her urine sample. Neither does she claim that they misreported the presence of EtG in her sample. She maintains only that because alcohol is present in everyday products like the hand sanitizers she used at her job, the defendants owed her a duty to avoid reporting false-positive results by adopting a minimum threshold which accurately indicates alcohol consumption instead of incidental exposure to alcohol. Further, she does not allege that the defendants failed to warn her or the Board of alternative sources of EtG, as the defendants seek to characterize her claim. Her claim is simply that the defendants set the threshold for a positive test result at a level that is arbitrary and scientifically unreliable.

The fundamental basis for the defendants' motion with respect to the negligence count was that they owed no duty to Berry. Whether a legal duty exists is an issue of law over which appellate courts have unlimited review. *Roe v. Kansas Dept. of SRS*, 278 Kan 584, 592, 102 P.3d 396 (2004). As expressed by our Supreme Court in *Blackmore v. Auer*, 187 Kan. 434, 441, 357 P.2d 765 (1960),

"[a]n act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation*; it is risk to another or to others within the range of apprehension. (*Pfalsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253)."

Three elements must be satisfied before a legal duty arises in Kansas. First, the plaintiff must be a foreseeable plaintiff, *i.e.*, "within the range of apprehension." *Durflinger v. Artiles*, 234 Kan. 484, 489, 673 P.2d 86 (1983), *disapproved on other grounds Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995).

Second, the probability of harm must be foreseeable. *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 338, 918 P.2d 1274 (1996). " '[T]he test of negligence . . . is not whether the [defendant] should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result.' [Citation omitted.]" 260 Kan. at 337-38; see *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n*, 251 Kan. 347, 351, 837 P.2d 330 (1992). Foreseeability as referred to in these first two tests is

" ' "a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm." ' [Citation omitted.]" *South v. McCarter*, 280 Kan. 85, 103-04, 119 P.3d 1 (2005).

Third, there must be no public policy against imposing the claimed duty on the defendant. *OMI Holdings*, 260 Kan. at 338 ("A court may choose not to recognize the duty if the duty goes against public policy."). But Kansas courts tread lightly on matters of public policy because the legislature is better equipped to establish public policy. For example, in *Ling v. Jan's Liquors*, 237 Kan. 629, 640, 703 P.2d 731 (1985), our Supreme Court deferred to the legislature and declined to impose liability on alcohol vendors for torts committed by inebriated patrons when the legislature had not enacted a dram shop act.

Berry easily satisfies the tests for a foreseeable plaintiff and foreseeable injury. Berry's circumstances stand in stark contrast to the classic circumstances of Mrs. Pfalsgraf, who was standing on the railroad platform when a man carrying a package of fireworks attempted to jump onto a train which had started to move. A railroad employee, attempting to help the man, dislodged the package of fireworks, causing them to fall to the tracks and explode. The concussion caused scales on the platform many feet away to fall, striking Pfalsgraf. See *Pfalsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). Berry, on the other hand, was not a bystander but the direct and immediate object of the defendants' conduct. Among those whom these defendants could foresee

asserting a claim against them for negligent testing, Berry clearly stands at the front of the line.

The harm Berry alleges was equally foreseeable by the defendants. The testing services promoted and provided by these defendants could be used by private employers evaluating prospective employees, by licensing agencies such as the Board here, or by courts when dealing with criminal defendants. Errors in administering alcohol testing programs or reporting their findings could lead to a prospective employee being rejected by a private employer or, in circumstances such as those present here, a licensed professional being denied the opportunity to continue in his or her profession. In the case of the courts, these errors could lead to the loss of personal freedom.

Here, the defendants solicited business from the Board to test nurses whose licenses were at risk because of claims of alcohol abuse. The defendants could clearly foresee that a positive test result could result in the loss of the test subject's license. The exact harm Berry claims to have experienced here was a foreseeable consequence of negligence in the testing and reporting of the test results to the Board.

Finally, there is no public policy against imposing liability. We defer to our legislature in establishing public policy and find no expression by our legislature that urinanalysis providers are exempt from liability for their negligence in providing faulty results or interpretations. These defendants, as testing providers to the Board, do not argue that they are protected by sovereign immunity. We find no public policy that would immunize these defendants from the consequences of their actions. Therefore, the third element for establishing a duty has been satisfied.

In this regard we note the dissent's public policy argument which is predicated upon the fact that this claim arose in the context of administrative proceedings to determine Berry's fitness to practice her profession. The dissent seems to confuse the wrongful conduct Berry complains of with the product of that wrongful conduct. The wrongful conduct in this action is the claimed negligence of Compass and NMS, not the action of the Board in revoking Berry's

nursing license. The consequence of this claimed negligence was the loss of Berry's license and the damages that followed.

We conclude that under Kansas law Berry has alleged the breach of a recognizable duty, and she has pled a cause of action for which relief may be granted.

Appellate courts in other states have reached the same conclusion we reach today. See *Stinson v. Physicians Immediate Care*, 269 Ill. App. 3d 659, 646 N.E. 2d 930 (1995); *Lewis v. Aluminum Co. of America*, 588 So. 2d 167 (La. App. 1992); *Duncan v. Afton, Inc.*, 991 P.2d 739 (Wyo. 1999).

Defendants, on the other hand, rely on *Perez-Rocha v. Com., Bureau of Pro.*, 933 A.2d 1102 (Pa. Commw. 2007), as contrary authority. There, the Pennsylvania Supreme Court affirmed the 3-year suspension of a medical doctor's license. 933 A.2d at 1108. The issue before the court was the sufficiency of the evidence supporting the agency's action, not whether the testing agency owed a duty to its test subject. Defendants rely on *Perez-Rocha* to establish the scientific reliability of EtG testing. The issue is not the reliability of the test itself, but the manner in which its results are reported. As we read Berry's amended petition, she does not challenge the scientific basis for EtG testing, she merely claims that the defendants were negligent in establishing an arbitrary and unreasonably low threshold for a positive test result. *Perez-Rocha* does not apply.

Defendants also rely on *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353-55 (Tex. 1995), which involved a preemployment drug screen which disclosed opiates in the applicant's urine. The applicant claimed that she tested positive because she had eaten poppy seeds before the test. She alleged that the testing laboratory had a duty to inform her or her employer that poppy seed consumption could cause a false-positive test result. She also claimed that the lab should have asked her before the test whether she had eaten poppy seeds. In rejecting this claim, the Texas Supreme Court found that the duty the plaintiff advocated would require the testing lab to "inform each test subject not only of the possible effect of poppy seeds but of all possible causes of positive results other than using drugs." 903 S.W.2d at 353. The court left open

the question "whether a drug testing lab . . . has a duty to use reasonable care in performing tests and reporting the results." 903 S.W.2d at 355.

*SmithKline Beecham* is not persuasive. Berry does not claim that the defendants had the duty to warn the Board of all the potential sources of EtG such as hand sanitizers. Rather, she alleges that the defendants were negligent in setting too low a threshold for a positive test result. The court in *SmithKline Beecham* was concerned that it was being asked to impose an unreasonable burden on testing entities by requiring them to inform each test subject of all possible sources and causes of positive test results. 903 S.W.2d at 353. The duty Berry seeks us to declare here would have no such burdensome effect.

The defendants also rely on *Willis v. Roche Biomedical Laboratories*, 61 F.3d 313 (5th Cir. 1995), a case decided about a week after *SmithKline Beecham*, which was based on Texas substantive law. In *Willis*, Roche provided random drug testing for DuPont. Willis, a DuPont employee, tested positive for methamphetamine and was placed on restricted work duty and sent to a physician. Three months later Roche informed DuPont that the test had registered a false positive by confusing the presence of an over-the-counter cold medicine with illegal methamphetamine. Upon learning of the mistake, DuPont compensated the employee for lost time and for medical expenses. The Fifth Circuit Court of Appeals, without undertaking a foreseeability analysis, relied on *SmithKline Beecham* in affirming the district court's entry of summary judgment in favor of Roche on Willis' negligence claim. 61 F.3d at 315-16. Since the holding in *Willis* is predicated entirely upon the decision in *SmithKline Beecham*, and since *SmithKline Beecham* is clearly distinguishable, we do not find *Willis* to be persuasive.

The other cases cited and discussed by the defendants, such as *Caputo v. Compuchem Laboratories, Inc.*, 1994 WL 100084, at *3-4 (E.D. Pa. 1994) (unpublished opinion), and *Vargo v. National Exchange*, 376 N.J. Super. 364, 870 A.2d 679 (2005), also involved claims that the testing entity failed to inform the employer that the positive test result could be attributable to causes other than the presence of illegal drugs. As discussed earlier, these cases are dis-

tinguishable from the claims before us. Berry makes no claim that the defendants had the duty to inform the Board of all the possible sources for the metabolite found in her urine sample. She simply claims that the threshold for a positive test result was set in a negligent fashion.

Berry presents an actionable claim for negligence against these defendants. The district court erred in dismissing Berry's amended petition for failure to state a claim.

### Consumer Protection Claim

The defendants claim that Berry's consumer protection claim is barred because it was not commenced within the period of applicable statute of limitations and because Berry's claim does not involve a consumer transaction. We need only address the latter defense.

Berry claims in her amended petition that she was the victim of deceptive practices in a consumer transaction with the defendants. This claim calls for our de novo interpretation of the Act. See *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008). In doing so, we give effect to the intent of the legislature as expressed through the language it employed. There is no need to speculate as to the legislature's intent when confronted with a statute that is clear and unambiguous on its face. When considering such a statute, we will not read into it something not readily found there. See *In re K.M.H.*, 285 Kan. 53, 79-80, 169 P.3d 1025 (2007), *cert. denied* 555 U.S. 937 (2008).

The Act applies to "consumers" engaged in "consumer transactions" with "suppliers." See K.S.A. 50-623(b); K.S.A. 50-624, comment (c); K.S.A. 50-626(a). A "consumer transaction" is the "sale, lease, assignment or other disposition for value of property or services . . . to a consumer." K.S.A. 50-624(c). We assume *arguendo* that drug testing is a "service" contemplated by the Act. See *Moore v. Bird Engineering Co.*, 273 Kan. 2, Syl. ¶ 4, 41 P.3d 755 (2002) (finding that an engineer who designed a bridge provided a service under the Act).

A close reading of Berry's amended petition discloses the following allegations:

- Compass contracted with the Board to be the third-party administrator for the Board's alcohol testing program for nurses.
- NMS contracted with the Board to do EtG testing of the nurses.
- NMS provided to the Board the results of alcohol testing.
- Nurses who abuse alcohol are required to submit to random urinalyses.
- Berry agreed with the Board to submit to random testing.
- Berry submitted to random testing in January and June 2005.

In Count II of her amended petition Berry incorporates the foregoing facts and adds that she "purchased the defendants EtG test for allowable purposes under the act and is therefore entitled to an award of [damages]." This reference to a "purchase" seems to be a contradictory characterization of the transactions described in detail earlier in her amended petition. Her factual allegations disclose transactions between the Board and the defendants but not a consumer transaction between Berry and the defendants.

Nowhere in her amended petition does Berry allege facts one could characterize as her exchanging anything of value with the defendants to secure their services. The Act only applies to "consumer transactions," which are "sales" or other "dispositions for value" of consumer goods or services. K.S.A. 50-624(c). Black's Law Dictionary 1364 (8th ed. 2004), defines "sale" as the exchange of "a thing" for "a price in money paid or promised." It defines "value" as the "money that something will command in an exchange." Black's Law Dictionary 1586.

While we liberally construe Berry's amended petition in search of any viable theory of recovery, we cannot ignore the obvious import of her specific allegations and accept her mischaracterization of them in order to preserve a consumer protection claim that obviously does not arise from a consumer transaction. Accordingly, we conclude that the district court did not err in dismissing Berry's consumer protection claim.

Affirmed in part, reversed in part, and remanded for further proceedings on the plaintiff's negligence claim.

BUSER, J., concurring in part and dissenting in part: I concur in my colleague's affirmance of the district court's dismissal of Berry's consumer protection claim. I dissent, however, from the reversal of the district court's dismissal of Berry's negligence claim.

It is the public policy of this state, as decided by the Kansas Legislature in its enactment of K.S.A. 65-1120, that the Kansas State Board of Nursing (Board) has authority to establish, regulate, and enforce the professional competency of nurses. Moreover, pursuant to K.S.A. 77-621(c), the legislature has granted the judiciary a limited power to review (using a deferential standard) the Board's disciplinary actions against impaired nurses. These legislatively established public policies are undermined by the majority's decision of first impression in Kansas. I would hold that laboratory testing facilities and third-party administrators do not owe a duty to nurses addicted to alcohol whose specimens they test under a contract with the administrative agency empowered by the legislature to regulate the professional competency of nurses.

I would add the following facts to those recounted by the majority. Berry pled that

"[b]ecause of the sensitive nature of their positions with respect to patient care, registered nurses in Kansas who have an admitted history of addiction, are required to enter into Recovery Program Agreements with [the Kansas Nurses Assistance Program] KNAP, by which they agree to submit to random observed urine analysis to document a drug-free condition known as 'zero-tolerance' environment."

In addition, Berry pled that she "signed a KNAP Agreement with the Board submitting herself to future random testing." She also pled that after her January 13, 2005, test was returned positive (2200 ng/mL), she "was suspended for two months[,] not allowed to work as a nurse," and suffered damage to her reputation with consequent anxiety, stress, and humiliation. According to Berry, after her June 1, 2005, test was also returned positive (290 ng/mL), she was

"unable to work as a nurse and faced with mandatory expensive inpatient treatment and suspension from work based on the EtG testing . . . [she] refused to continue in the KNAP program because of the unfairness of the EtG testing, and

in August 2005 her nursing license in Kansas was revoked, preventing her from employment as a nurse." (Emphasis added.)

As my colleagues acknowledge, "the fact that a duty *may* arise from the foreseeablity of harm does not always mean that such duty actually arises. A court may choose not to recognize the duty if the duty goes against public policy." *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 338, 918 P.2d 1274 (1976). In *OMI Holdings*, our Supreme Court held that a witness owed no duty to the parties in litigation to refrain from improper contact with jurors, even where a mistrial was foreseeable, "because it places an intolerable burden on all witnesses and may deter witnesses from testifying." 260 Kan. at 338.

The majority also properly recognizes that courts typically defer to the legislature on questions of public policy. See *Ling v. Jan's Liquors*, 237 Kan. 629, Syl. ¶ 5, 703 P.2d 731 (1985). In *Ling*, the issue was whether Kansas should, "in the absence of a dram shop act," impose a duty on liquor sellers to protect those who might be harmed by liquor sales. 237 Kan. at 635. The common law did not recognize such a duty, and our Supreme Court decided to leave the public policy decision to the legislature:

"Although empowered to change the common law in light of changed conditions, this court recognizes that declaration of public policy is normally the function of the legislative branch of government. Whether Kansas should abandon the old common-law rule and align itself with the new trend of cases which impose civil liability upon vendors of alcoholic beverages for the torts of their inebriated patrons depends ultimately upon what best serves the societal interest and need. Clearly, this is a matter of public policy which the legislature is best equipped to handle." 237 Kan. at 640.

In the present case, my colleagues err by concluding that our legislature has not spoken. Under K.S.A. 65-1114(a)(1)-(4), it is unlawful for any person to practice professional nursing in Kansas "unless such person has been duly licensed." Under K.S.A. 65-1120(a)(6), the Board may "deny, revoke, limit or suspend any license" if, after a hearing, the licensee is found to "be guilty of unprofessional conduct as defined by the rules and regulations of the board." Those rules and regulations define unprofessional con-

duct to include "failing to complete the requirements of the impaired provider program of the [B]oard." K.A.R. 60-3-110(s).

Assuming the amended petition is true, Berry's license was suspended, she was required to enter and complete treatment, and her license was eventually revoked, not by Compass Vision, Inc. (Compass), or National Medical Services, Inc. (NMS), which are private entities doing business with each other and the Board, but by the administrative agency empowered by the legislature to discipline impaired nurses.

The context in which Berry's claim arose—a governmental agency action to discipline a nurse for unprofessional conduct—is an important matter of public health and safety. This situation is clearly distinguishable from the typical claim which might be stated against a laboratory testing facility which negligently tests for illicit drugs and alcohol and, as a result, an employee is subjected to adverse action by a private employer. Laboratory testing facilities are typically the targets of such lawsuits because the employment was terminable at will or because the employer would have some other basis, such as a good-faith reliance on the test result, to justify its action. See Comment, *Imposing Liability on Drug Testing Laboratories for 'False Positives': Getting Around Privity*, 64 U. Chi. L. Rev. 287, 296-97 (1997).

The cases cited by Berry and relied on by the majority fall into this category. In *Stinson v. Physicians Immediate Care*, 269 Ill. App. 3d 659, 664, 646 N.E.2d 930 (1995), for example, the Illinois Appellate Court reasoned:

"[T]he injury, that the plaintiff would be terminated from his employment, is not only foreseeable, but also is a virtual certainty in the event of a positive drug test result. In addition, the likelihood of injury is great; the plaintiff allegedly lost his job and was hindered in his efforts to find other employment because of the false positive drug test report."

In marked contrast, Berry's licensure was not terminable at will. To the contrary, Berry possessed important *due process rights* to her nursing license. See *Murphy v. Nelson*, 260 Kan. 589, 598, 921 P.2d 1225 (1996) (property interests generally); see also *Neal v. Fields*, 429 F.3d 1165, 1167 (8th Cir. 2005) (nursing license is a property interest); *Ross v. Indiana State Bd. of Nursing*, 790

N.E.2d 110, 121 (Ind. App. 2003) (same); *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 494 (Miss. 1993) (same). Accordingly, through the administrative scheme promulgated by the legislature, Berry possessed a panoply of rights which afforded her every opportunity to raise the myriad of complaints she had regarding the EtG testing and redressing any disciplinary action taken by the Board.

Berry, however, chose not to invoke her due process rights under Kansas law. She withdrew from KNAP, and she does not allege that she contested the Board's subsequent revocation of her nursing license. Instead, Berry collaterally attacked the Board's adverse administrative action by claiming the laboratory facility and third-party administrator owed her, among other things, a duty of ordinary care in setting a threshold for positive alcohol testing.

I believe the legislature is best equipped to know "what best serves the societal interest and need." *Ling*, 237 Kan. at 640. The Board's administrative procedures both insure Berry's due process rights to licensure and also protect the health and safety of patients under the care and treatment of impaired nurses. It is not the public policy of Kansas to conduct administrative procedure through private causes of action. To find a duty owed to an impaired nurse by a private laboratory facility and a third-party administrator doing business with the Board is to sanction circumvention of the Board's authority. This approach is contrary to the legislature's clear intent to empower the Board to afford due process to impaired nurses, to establish appropriate rules and procedures for compliance with KNAP, and, when appropriate, to discipline impaired nurses in order to insure the public's health and safety.

Additionally, pursuant to K.S.A. 65-1121a, "[a]ny agency action of the [Board] . . . is subject to review in accordance with the act for judicial review and civil enforcement of agency actions," K.S.A. 77-601 *et seq*. Instead of acknowledging the legislature's limited grant of authority to the courts in this area, *i.e.*, to review the Board's decisions under the deferential standard of K.S.A. 77-621(c), my colleagues would have the courts rule in the first instance, with the Board presumably to show deference to the courts

even in the matters specifically entrusted to it by the legislature. I do not believe the courts are in a better position than the Board to determine the appropriate margin of safety for nurses with an alcohol dependency who provide care and treatment to their patients.

In short, the result reached by my colleagues contradicts the well-established relationship between the courts and administrative agencies. See *Lacy v. Kansas Dental Board*, 274 Kan. 1031, 1040, 58 P.3d 668 (2002) (district courts may not substitute its judgment for that of an administrative agency); *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 389, 996 P.2d 821 (2000) ("Because agency decisions are frequently of a discretionary nature or frequently require specific expertise, the agency should be given the first chance to exercise that discretion or to apply that specific expertise.").

This lack of deference to the Board is also reflected in the majority's foreseeability of harm analysis. Although my colleagues contend that Compass and NMS should have foreseen that Berry's licensure could be harmed by a negligently determined positive test result, the decisions regarding KNAP compliance and Berry's licensure undoubtedly remained with the Board. This is a question of law, not fact. Berry could not, by mere pleading, turn the Board into an appendage of Compass and NMS. I also do not read Berry's petition to make that particular claim.

It was, therefore, not foreseeable that invalid test results would result in the Board's adverse action against Berry's nursing license. Berry had an opportunity to contest the results both at the agency level and before the courts, if necessary. In this way, the Board's status as an administrative agency distinguishes it from a private employer for purposes of foreseeablity.

Finally, Berry did not allege that her license was revoked after the first or even the second positive test result. Berry alleged that her license was revoked *after she voluntarily withdrew from KNAP*. Given this factual assertion by Berry, it appears that any harm she sustained was not foreseeable as a result of one or two positive test results, but was due to her own conduct in withdrawing from the impaired nurses program.

I would affirm the district court's dismissal of the amended petition.