169 P.3d 1025 (2007)
In the Interest of K.M.H., a child under age eighteen, and K.C.H., a child under age eighteen.
In the Matter of the Paternity of K.C.H. and K.M.H., by and through their next friend, D.H., Appellant, and
S.H., Appellee.
No. 96,102.
Supreme Court of Kansas.
October 26, 2007.
*1029 Kurt L. James, of Topeka, argued the cause and was on the briefs for appellant.
Susan Barker Andrews, of Topeka, argued the cause and was on the briefs for appellee.
Linda Henry Elrod, Distinguished Professor of Law and Director, of Topeka, was on the brief for amicus curiae Washburn University School of Law Children and Family Law Center.
Timothy M. O'Brien, of Shook Hardy & Bacon. L.L.P., of Overland Park, was on the brief for amicus curiae Family Law Professors.
The opinion of the court was delivered by BEIER, J.:
This appeal from a consolidated child in need of care (CINC) case and a paternity action arises out of an artificial insemination leading to the birth of twins K.M.H. and K.C.H. We are called upon to decide the existence and extent of the parental rights of the known sperm donor, who alleges he had an agreement with the children's mother to act as the twins' father.
The twins' mother filed a CINC petition to establish that the donor had no parental rights under Kansas law. The donor sued for determination of his paternity. The district court sustained the mother's motion to dismiss, ruling that K.S.A. 38-1114(f) was controlling and constitutional. That statute provides:
"The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the birth father of a child thereby conceived, unless agreed to in writing by the donor and the woman." K.S.A. 38-1114(f).

Factual and Procedural Background
Many of the underlying facts are undisputed. The mother, S.H., is an unmarried female lawyer who wanted to become a parent through artificial insemination from a known donor. She was a friend of the donor, D.H., an unmarried male nonlawyer, who agreed to provide sperm for the insemination. Both S.H. and D.H. are Kansas residents, and their oral arrangements for the donation occurred in Kansas, but S.H. underwent two inseminations with D.H.'s sperm in Missouri.
D.H. accompanied S.H. to a Missouri clinic for the first procedure and provided the necessary sperm to medical personnel. The first procedure did not result in a pregnancy. D.H. did not accompany S.H. to Missouri for the second procedure. Instead, he provided the sperm to S.H., and she delivered it to the Missouri physician responsible for the insemination. The second procedure resulted in S.H.'s pregnancy and the birth of the twins.
There was no formal written contract between S.H. and D.H. concerning the donation of sperm, the artificial insemination, or the expectations of the parties with regard to D.H.'s parental rights or lack thereof.
The twins were born on May 18, 2005. The day after their birth, S.H. filed a CINC petition concerning the twins, seeking a determination that D.H. would have no parental rights. The petition identified D.H. as "[t]he minor children's father" and alleged that the twins were in need of care "as it relates to the father" and that "the [f]ather should be found unfit and his rights terminated." The petition continued to refer to D.H. throughout as the twins' father.
On May 31, 2005, D.H. filed an answer to the CINC petition and filed a separate paternity action acknowledging his financial responsibility for the children and claiming parental rights, including joint custody and visitation. The CINC and paternity actions were consolidated. S.H. filed a motion to dismiss the paternity action, invoking K.S.A. 38-1114(f). After the motion was filed, the district judge raised questions concerning *1030 choice of law and the constitutionality of the statute and ordered the parties to brief these issues along with the other issues arising out of the motion to dismiss.
In her brief, S.H. argued Kansas law should apply because her original oral agreement with D.H. took place in Kansas; the parties reside in Kansas; the sperm resulting in the pregnancy was given to her by D.H. in Kansas; and the children reside in Kansas. In her view, the single fact that the procedure was performed by a doctor in Missouri did not constitute a significant contact with that state, and Missouri did not have a sufficient ongoing interest in the parties or in the subject matter of their dispute.
On the merits, S.H. principally relied upon K.S.A. 38-1114(f). S.H. argued that her CINC petition did not constitute her written assent to D.H.'s parental rights under K.S.A. 38-1114(f). She also asserted that the mutual preinsemination intent of the partiesโas a single mother-to-be and a sperm donor only, not as co-parentsโwas clear from their actions during the pregnancy. According to S.H., she sought out fertility tests and treatments on her own; D.H. did not attend the second procedure or sonograms or other prenatal medical appointments; and he did not provide emotional support or financial assistance during the pregnancy or after the twins' birth. She also argued that D.H. was morally, financially, and emotionally unfit to be a father.
In his arguments in the district court, D.H. maintained that he had standing to file his paternity action as the biological father of K.M.H. and K.C.H. On choice of law, D.H. argued that Kansas conflict principles required the court to look to the place of either contract formation or contract performance. He asserted that the "more sensible" approach in this case would be to apply the law of the state where performance occurred, which was, according to him, where the artificial insemination was performed. D.H. said Missouri has no statute barring a presumption of paternity for a known sperm donor for an unmarried woman; paternity is proved by "consanguinity or genetic test." D.H. also asserted that no doctor would perform an insemination on an unmarried woman in Topeka, Lawrence, or Kansas City, Kansas, and suggested a Kansas doctor could have had a duty to discuss the legal implications of the procedure under Kansas law while a Missouri doctor would not.
In the event the court held that Kansas law governed, D.H. argued that K.S.A. 38-1114(f) unconstitutionally deprived him of his right to care, custody, and control of his children and violated public policy "support[ing] the concept of legitimacy and the concomitant rights of a child to support and inheritance." If the statute is constitutional, he asserted, its dictate of nonpaternity of a sperm donor should not apply to him because he had provided his sperm to S.H. rather than to a licensed physician. He also cited the CINC petition's identification of him as the twins' "father" and its faulting of him for failing to do things consistent with parenthood. D.H. asserted the wording of the CINC petition was evidence of the parties' mutual intent to take themselves out from under the statutory provision for nonpaternity. He also contended that he had offered financial assistance and attempted to visit the children in the hospital after their birth and on subsequent occasions, but that he was prevented from doing so by S.H.
The district judge ruled that Kansas law governed, that K.S.A. 38-1114(f) was constitutional and applicable, and that the CINC petition did not constitute a written agreement departing from the provision for nonpaternity set forth in the statute. The judge therefore granted S.H.'s motion, concluding as a matter of law that D.H. had no legal rights or responsibilities regarding K.M.H. and K.C.H.

Issues on Appeal
On appeal, both parties reiterate the arguments they made to the district court, and D.H. alleges for the first time that another statutory provision and equity favor his side of the case. We therefore address six issues: (1) Did the district judge err in ruling that Kansas law would govern? (2) Did the district judge err in holding K.S.A. 38-1114(f) constitutional under the Equal Protection and Due Process Clauses of the Kansas and the federal Constitutions? (3) Did the district *1031 judge err in interpreting and applying the "provided to a licensed physician" language of K.S.A. 38-1114(f)? (4) Did the district judge err in determining that the CINC petition did not satisfy the requirement of a writing in K.S.A. 38-1114(f)? (5) Did K.S.A. 38-1114(a)(4) grant D.H. parental rights? and (6) Does equity demand reversal of the district court?
On this appeal, we also have the benefit of briefs from two amici curiaeโone from the Washburn University School of Law's Children and Family Law Center (Center), which argues that K.S.A. 38-1114(f) is unconstitutional as applied to known sperm donors, and one from family law professors Joan Heifetz Hollinger, et al., who argue that K.S.A. 38-1114(f) is constitutional and that it should be applied consistently with its plain language to bar D.H.'s assertion of paternity.

Standing and Standard of Review
The parties do not appear to dispute D.H.'s standing to bring a paternity action at this stage in the proceedings, but we note briefly as a preliminary matter that his standing is not in serious doubt. K.S.A. 38-1115(a)(1) permits a child "or any person on behalf of such a child" to bring a paternity action "to determine the existence of a father and child relationship presumed under K.S.A. 38-1114." It is D.H.'s position that his fatherhood of the twins should be presumed under the statute.
Regarding standard of review, each of the issues raised on appeal presents a pure question of law reviewable de novo by this court. Kluin v. American Suzuki Motor Corp., 274 Kan. 888, 893, 56 P.3d 829 (2002). Although S.H.'s motion was titled "Motion to Dismiss," the district judge considered materials beyond the pleadings, essentially treating the motion as one for summary judgment. We are therefore mindful of our often stated standard of review following summary judgment in the district court: We must view the evidence in the light most favorable to the nonmoving party, D.H. See Wachter Management Co. v. Dexter & Chaney, Inc., 282 Kan. 365, 368, 144 P.3d 747 (2006). The district court's judgment for the moving party, S.H., should be affirmed on appeal if there remains no genuine issue of material fact for trial and the case is appropriate for disposition in her favor as a matter of law. See K.S.A. 60-256; Scott v. Hughes, 281 Kan. 642, 644, 132 P.3d 889 (2006); Kluin, 274 Kan. at 893, 56 P.3d 829.

Choice of Law
The United States Supreme Court has held:
"In deciding constitutional choice-of-law questions, whether under the Due Process Clause or the Full Faith and Credit Clause, this Court has traditionally examined the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation. [Citation omitted.] In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair [citation omitted], the Court has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." Allstate Ins. Co. v. Hague, 449 U.S. 302, 308, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).
Various factors are relevant to a choice-of-law determination, including the procedural or substantive nature of the question involved, the residence of the parties involved, and the interest of the State in having its law applied. Sun Oil Co. v. Wortman, 486 U.S. 717, 736, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (Brennan, J., concurring). "`As long as Kansas has "`significant contact or [a] significant aggregation of contacts' . . . to ensure that the choice of Kansas law is not arbitrary or unfair," constitutional limits are not violated.' [Citations omitted.]" Brenner v. Oppenheimer & Co., 273 Kan. 525, 534, 44 P.3d 364 (2002); see Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (citing Allstate Ins. Co. v. Hague, 449 U.S. at 312-13, 101 S.Ct. 633); Dragon v. Vanguard Industries, Inc., 277 Kan. 776, 790, 89 P.3d 908 (2004). Also, to the extent this case is viewed as a contractual dispute, Kansas courts apply the Restatement (First) of Conflict of Laws ง 332 (1934), and the doctrine of lex loci contractus, i.e., *1032 the law of the state where the contract is made governs. See ARY Jewelers v. Krigel, 277 Kan. 464, 481, 85 P.3d 1151 (2004); Wilkinson v. Shoney's, Inc., 269 Kan. 194, 209-10, 4 P.3d 1149 (2000); Foundation Property Investments v. CTP, 37 Kan.App.2d 890, Syl. ถ 4, 159 P.3d 1042 (2007); Layne Christensen Co. v. Zurich Canada, 30 Kan.App.2d 128, 141-42, 38 P.3d 757 (2002). A contract is made where the last act necessary for its formation occurs. ARY Jewelers, 277 Kan. at 481-82, 85 P.3d 1151; Wilkinson, 269 Kan. at 210, 4 P.3d 1149; Foundation Property Investments, 37 Kan.App.2d at 894-95, 159 P.3d 1042; Layne Christensen Co., 30 Kan. App.2d at 141-43, 38 P.3d 757.
"Generally the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply. Failure to present facts sufficient to determine where the contract is made may justify a default to forum law." Layne Christensen Co., 30 Kan.App.2d at 143-44, 38 P.3d 757. In addition, we note that Kansas courts have often leaned toward a lex fori, or law of the forum, approach, opting to apply Kansas law absent a clear showing that another state's law should apply. See Dragon, 277 Kan. at 790, 89 P.3d 908; Systems Design v. Kansas City P.O. Employees Cred. Union, 14 Kan. App.2d 266, 269, 788 P.2d 878 (1990). Moreover, our Court of Appeals has recognized in a case focused on the legitimacy of a child that, "[i]n our current mobile society, place of conception of child carries little weight [in choice of law determination]." In re Adoption of Baby Boy S., 22 Kan.App.2d 119, 126, 912 P.2d 761, rev. denied 260 Kan. 993, cert. denied 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996). Instead, "[w]hether a child is legitimate is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the child and the parent"; considerations include "the relative interests of those states in the determination of the particular issue," "the protection of justified expectations," "the basic policies underlying the particular field of law," and the "certainty, predictability and uniformity of result." Restatement (Second) of Conflict of Laws ง 6, ง 287(1) & comment d (1969).
D.H. urges us to follow the lead of the Illinois Supreme Court in In Re Marriage of Adams, 133 Ill.2d 437, 447, 141 Ill.Dec. 448, 551 N.E.2d 635 (1990), which applied the law of the state where an insemination was performed because it would "fulfill the participants' expectations and . . . help insure predictability and uniformity of result."
In Adams, a husband and wife had been Florida residents; their consultations concerning fertility options occurred in Florida; the artificial insemination from an anonymous donor was performed by a Florida doctor in his Florida clinic; and the baby was born in Florida and was a Florida resident until the wife moved herself and the child to her parents' home in Illinois and then filed for divorce. The husband sought a determination of nonpaternity, and the court determined that Florida law should govern because Florida had a more significant relationship than Illinois to the parentage dispute. 133 Ill.2d at 447, 141 Ill.Dec. 448, 551 N.E.2d 635.
The facts of this case bear little resemblance to the facts of Adams. Here, the parties are Kansas residents. Whatever agreement that existed between the parties was arrived at in Kansas, where they exchanged promises supported by consideration, and D.H. literally delivered on his promise by giving his sperm to S.H. The twins were born in Kansas and reside in Kansas. The only fact tying any of the participants to Missouri is the location of the clinic where the insemination was performed.
Under these circumstances, we hold that Kansas law applies and that significant contacts and a significant aggregation of contacts with Kansas make application of our law to the parties' claims not only appropriate but also constitutional. This choice is neither arbitrary nor unfair; neither party would have been justified in expecting Missouri to have a controlling interest as to any dispute between them.

Constitutionality of K.S.A. 38-1114(f)
In his brief, D.H. makes a general allegation that K.S.A. 38-1114(f) offends the Constitution. *1033 The cases he cites in support discuss both the Equal Protection Clause and the Due Process Clause; we thus presume his challenge relies upon each of these provisions. See U.S. Const. amend. XIV; Kan. Const. Bill of Rights, งง 2, 18. At oral argument before this court, D.H. conceded that his rights under these provisions do not differ as between the federal and state Constitutions. He also acknowledged that he no longer challenges the statute as unconstitutional on its face; rather, he argues it cannot be constitutionally applied to him, as a known sperm donor who alleges he had an oral agreement with the twins' mother that granted him parental rights. The amicus brief filed by the Center further clarifies that the constitutional challenge before us is only to the statute as applied to D.H.
The Center insists the statute deprives D.H. of parental rights without due process of law and without a required finding of unfitness. It urges us to dispense with a literal reading of the statute's language, invoking the purported purpose of the Kansas Parentage Act, K.S.A. 31-1110 et seq., to encourage fathers to acknowledge paternity and child support obligations voluntarily. It also emphasizes that courts should seek a result geared to the best interests of the child, in this case advancing a public policy favoring the right of every child to two parents, regardless of the means of the child's conception.
As mentioned in summary above, our review of whether a statute is constitutional raises a question of law reviewable de novo. In re Tax Appeals of CIG Field Services Co., 279 Kan. 857, 866-67, 112 P.3d 138 (2005). In addition,
"`[t]he constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt.' [Citations omitted]." State v. Rupnick, 280 Kan. 720, 736, 125 P.3d 541 (2005).
Given the relative newness of the medical procedure of artificial insemination, and thus the newness of K.S.A. 38-1114(f)'s attempt to regulate the relationships arising from it, it is not surprising that the issue raised by D.H. is one of first impression, not only in Kansas but nationally. We therefore begin our discussion of the constitutionality of the statute by surveying the landscape of various states' laws governing the rights of sperm donors for artificial insemination. This landscape and its ongoing evolution provide helpful context for our analysis of K.S.A. 38-1114(f).
The majority of states that have enacted statutes concerning artificial insemination state that the husband of a married woman bears all rights and obligations of paternity as to any child conceived by artificial insemination, whether the sperm used was his own or a donor's. See, e.g., Ala.Code ง 26-17-21(a) (1992) ("If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived."); see also Cal. Fam.Code ง 7613(a) (West 2004) (same); Colo.Rev.Stat. ง 19-4-106(1) (West 2005) (same); Ill. Comp. Stat. ch. 750 40/3(a) (West 1999) (same); Minn. State ง 257.56 Subd. 1 (2007); Mo. Rev.Stat. 210.824(1) (2000) (same); Mont. Code Ann. ง 40-6-106(1) (2005); Nev.Rev. Stat. ง 126.061(1) (2005) (same); N.J. Stat. Ann. ง 9:17-44(a) (2002) (same); N.M. Stat. Ann. ง 40-11-6(A) (Michie 2006) (same); Ohio Rev.Code Ann. ง 3111.95(A) (Anderson 2003) (similar); Wis. Stat. ง 891.40(1) (2005-06) (same). Further, several of these states' statutes provide that a donor of semen used to inseminate a married woman will not be treated in law as the father of any child conceived, if he is not the woman's husband. See, e.g., Ala.Code ง 26-17-21(b) (1992) ("The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."); Minn. *1034 Stat. ง 257.56 Subd. 2 (2007) (same); Mo. Rev.Stat. ง 210.824(2) (2000) (same); Mont. Code Ann. ง 40-6-106(2) (2005) (same); Nev. Rev.Stat. ง 126.061(2) (2005) (same). One court has observed that these two rules protect the expectations of the married couple, the best interests of the child, and the expectations of the donor. See People v. Sorensen, 68 Cal.2d 280, 284-88, 66 Cal.Rptr. 7, 437 P.2d 495 (1968).
The 1973 Uniform Parentage Act, promulgated by the National Conference of Commissioners on Uniform State Laws, 9B U.L.A. 377 (2001), provided the model for many of the state artificial insemination statutes that incorporate these two rules. See, e.g., Cal. Fam.Code ง 7613; N.M. Stat. Ann. ง 40-11-6. Section 5 of the original uniform Act provided:
"(a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and file the husband's consent with the [State Department of Health], where it shall be kept confidential and in a sealed file. However, the physician's failure to do so does not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown.
"(b) The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (Emphasis added.) Uniform Parentage Act (1973) ง 5; 9B U.L.A. at 407-08.
The wording of this original Act and statutes that imitated it did not address the determination of a sperm donor's paternity when an unmarried woman conceived a child through artificial insemination. The earliest case to address this particular question arose in a state that had not yet adopted any statute regarding the effects of the procedure.
In that case, C.M. v. C.C., 152 N.J.Super. 160, 377 A.2d 821 (1977), a sperm donor filed a paternity suit, seeking parental rights to a child born when the child's unmarried mother artificially inseminated herself with the donor's sperm. In that case, the mother and the donor had been in a long-standing romantic relationship; the donor testified they were contemplating marriage; the mother wanted a child but did not want to have sexual intercourse before marriage; and the insemination procedure was performed at the mother's home. Three months into the pregnancy, the mother ended her relationship with the donor, and she refused him access to the child after its birth.
The New Jersey court relied upon a common-law presumption of paternity to award visitation rights to the donor as the "natural father" of the "illegitimate child." Had the mother and the donor been married and conceived the child through artificial insemination, the court said, the donor would have been considered the child's father. Given the evidence that the parties had intended to parent the child together, the court believed the same result should follow, despite the absence of wedding vows. 152 N.J.Super. at 165-68, 377 A.2d 821.
Certain states other than New Jersey either anticipated the need for their original statutes to govern the relationship of a sperm donor to the child of an unmarried recipient as well as a married recipient or modified their original uniform Act-patterned statutes to remove the word "married" from the ง 5(b) language. This meant these states' statutes contained complete bars to paternity for any sperm donor not married to the recipient, regardless of whether the recipient was married to someone else and regardless of whether the donor was known or anonymous. An example of such a provision reads: "The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's *1035 wife is treated in law as if he were not the natural father of a child thereby conceived." See, e.g., Cal. Fam.Code ง 7613(b) (West 2004); Ill. Comp. Stat. ch. 750 40/3(b) (West 1999); Wis. Stat. ง 891.40(2) (2005-06) (same); see also Colo.Rev.Stat. ง 19-4-106(2) (West 2005) (substantially similar); Conn. Gen.Stat. ง 45a-775 (2007) (similar); Idaho Code ง 39-5405 (2002) (similar); Ohio Rev.Code Ann. ง 3111.95(B) (Anderson 2003) (same); Va.Code Ann. ง 20-158(A)(3) (2004) (substantially similar).
Four cases interpreting one of these types of statutes covering both married and unmarried recipients and establishing an absolute bar to donor paternity were decided before a 2000 amendment to the uniform Act made it applicable to unmarried as well as married recipients of donor sperm. See Uniform Parentage Act (2000); 9B U.L.A. 295 (West 2001).
The first of the four arose in California in 1986. In that case, Jhordan C. v. Mary K., 179 Cal.App.3d 386, 224 Cal.Rptr. 530 (1986), a donor provided sperm to one of two unmarried women who had decided to raise a child together. California had adopted the language of the 1973 Uniform Act with the exception that it had omitted the word "married" in the second subsection. Jhordan C., 179 Cal.App.3d at 392, 224 Cal.Rptr. 530 (citing then-existing Cal. Civ.Code ง 7005 [West 1979], which now appears, substantially unchanged, in Cal. Fam.Code ง 7613 [West 2004]). As the court put it:
"[T]he California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support. Subdivision (b) states only one limitation on its application: the semen must be `provided to a licensed physician.' Otherwise, whether impregnation occurs through artificial insemination or sexual intercourse, there can be a determination of paternity with the rights, duties and obligations such a determination entails." Jhordan C., 179 Cal.App.3d at 392, 224 Cal.Rptr. 530.
Because the parties had no doctor involved in the donation or insemination and thus the sperm was never "provided to a licensed physician," the court ruled that the case before it fell outside the statute. It therefore affirmed the lower court's recognition of the donor's paternity. Jhordan C., 179 Cal. App.3d at 398, 224 Cal.Rptr. 530. Although the court addressed its ruling's impact on the constitutional rights of the two women, it did not address any constitutional implications for the donor. Jhordan C., 179 Cal.App.3d at 395-96, 224 Cal.Rptr. 530.
The second case, In Interest of R.C., 775 P.2d 27 (Colo.1989), arose in Colorado in 1989. In that case, the district court had refused to admit proffered evidence of an agreement that the donor would act as a father based on relevance; it granted the unmarried mother's motion to dismiss the donor's paternity suit based on Colorado's statute. The Colorado provision, like that in California, applied to both married and unmarried recipients and contained a blanket bar to donor parental rights. See Colo.Rev. Stat. ง 19-4-106.
The Colorado Supreme Court reversed the district court and remanded for findings of fact. It explicitly rejected the idea that an unmarried recipient lost the protection of the statute "merely because she knows the donor." R.C., 775 P.2d at 35. And it did not reach the equal protection and due process challenges raised by the donor. However, it concluded the statute was ambiguous and refused to apply its absolute bar to paternity because the known donor had produced evidence of an oral agreement that he would be treated as father of the child. R.C., 775 P.2d at 35.
The next case, McIntyre v. Crouch, 98 Or.App. 462, 780 P.2d 239 (1989), cert. denied 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990), involved an unmarried woman who artificially inseminated herself with a known donor's semen. The donor sought recognition of his paternity, and both he and the woman sought summary judgment. The Oregon artificial insemination statute read:

*1036 "If the donor of semen used in artificial insemination is not the mother's husband: (1) Such donor shall have no right, obligation or interest with respect to a child born as a result of the artificial insemination; and (2) A child born as a result of the artificial insemination shall have no right, obligation or interest with respect to the donor." Ore.Rev.Stat. ง 109.239 (1977).
The donor challenged this statute under equal protection and due process principles. He swore out an affidavit in support of summary judgment and argued he had relied on an agreement with the mother that he "would remain active" in the child's life and "participate in all important decisions concerning the child." 98 Or.App. at 464, 780 P.2d 239. He sought visitation and said that he was willing and able to accept the same level of responsibility for the support, education, maintenance, and care of the child and for pregnancy-related expenses that he would have had if the child had been born from his marriage to its mother. The district court ruled that the donor's paternity claim was barred by the Oregon statute.
The McIntyre court began its analysis by reciting its equal protection standard of review, which was strict scrutiny, a standard more searching than that applied to such claims in Kansas. See generally State v. Limon, 280 Kan. 275, 283-87, 122 P.3d 22 (2005) (equal protection challenge based on gender discrimination does not require strict scrutiny, i.e., showing classification necessary to serve compelling state interest; rather, court applies intermediate scrutiny, i.e., classification must substantially further legitimate legislative purpose); see Chiles v. State, 254 Kan. 888, 891-93, 869 P.2d 707, cert. denied 513 U.S. 850, 115 S.Ct. 149, 130 L.Ed.2d 88 (1994); Farley v. Engelken, 241 Kan. 663, 669, 740 P.2d 1058 (1987). The Oregon court stated: "A statute that gives a privilege to women while denying it to men is inherently suspect and subject to strict scrutiny, unless the classification (1) is based on specific biological differences between men and women and (2) is rationally related to the purposes of the statute." McIntyre, 98 Or. App. at 469, 780 P.2d 239.
Under this standard, the Oregon court ruled that the statute before it drew an acceptable "classification of unmarried males and unmarried females . . . based on biological differences. . . . Only a male could contribute the sperm to accomplish conception; only a female could conceive and bear the child." 98 Or.App. at 469-470, 780 P.2d 239. Further, the classification was rationally related to the purposes of the statute, which were: (1) to allow married couples to have children, even though the husband was infertile, impotent, or ill; (2) to allow an unmarried woman to conceive and bear a child without sexual intercourse; (3) to resolve potential disputes about parental rights and responsibilities: that is, (a) the mother's husband, if he consents, is father of the child, and (b) an unmarried mother is free from any claims by the donor of parental rights; (4) to encourage men to donate semen by protecting them against any claims by the mother or the child; and (5) to legitimate the child and give it rights against the mother's husband, if he consented to the insemination. 98 Or.App. at 467-68, 470, 780 P.2d 239. Thus the statute did not offend equal protection either on its face or as applied.
The court also rebuffed the donor's due process challenge to the statute on its face. 98 Or.App. at 470, 780 P.2d 239. However, the donor also argued that the statute violated due process under the federal and state Constitutions as applied to him, a known donor who had an agreement with the mother to share the rights and responsibilities of parenthood. The court agreed the statute would violate the Due Process Clause of the Fourteenth Amendment as applied to the donor if such an agreement was proved. 98 Or.App. at 470-72, 780 P.2d 239.
On this point, the court looked to Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), an adoption case. Lehr dealt with the necessity of notice of pending adoption proceedings to an unwed father who had not filed with New York's putative father registry and had never established a substantial relationship with the child. The Court stated:
"When an unwed father demonstrates a full commitment to the responsibilities of *1037 parenthood by `com[ing] forward to participate in the rearing of his child,' [citation omitted], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. . . . But the mere existence of a biological link does not merit equivalent constitutional protection." Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (quoted in McIntyre, 98 Or.App. at 470, 780 P.2d 239).
The Lehr Court ultimately held that the State's failure to notify the father of adoption proceedings did not deny him due process of law. 463 U.S. at 264-65, 103 S.Ct. 2985. No substantive due process right to care, custody, and control of the child had vested in a man who could demonstrate nothing more than a biological link to his offspring. 463 U.S. at 258-62, 103 S.Ct. 2985. The Lehr Court noted, however, that an unwed father who demonstrated "a full commitment to the responsibilities of parenthood" could not be absolutely barred from asserting his parental rights without a violation of due process. 463 U.S. at 261, 103 S.Ct. 2985.
The McIntyre court reasoned that the Due Process Clause should afford no less protection to a sperm donor who had facilitated artificial insemination than an unwed father, "provided that [the sperm donor] could prove the facts" in his summary judgment affidavit that tended to support the existence of an agreement with the mother and his reliance upon it. Because the court concluded the constitutionality of the Oregon statute as applied to this donor would turn on whether he was given an opportunity to establish those facts, summary judgment in favor of the mother was reversed. 98 Or.App. at 472, 780 P.2d 239.
The last of the four cases, C.O. v. W.S., 64 Ohio Misc.2d 9, 639 N.E.2d 523 (1994), also concluded, as the McIntyre court did, that a statute purporting to be an absolute bar to paternity of sperm donors, while constitutional in the absence of an agreement to the contrary, could be unconstitutional as applied when the donor can establish that an agreement to share parenting existed between him and the unmarried woman who was the recipient of the sperm. 64 Ohio Misc.2d at 12, 639 N.E.2d 523.
In C.O., the Ohio statute at issue stated: "If a woman is the subject of a non-spousal artificial insemination, a donor shall not be treated in law or regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall not be treated in law or regarded as the natural child of the donor." See Ohio Rev.Code Ann. ง 3111.95 (Anderson 2003). The statute also required artificial insemination to be conducted under the supervision of a physician. 64 Ohio Misc.2d at 10-11, 639 N.E.2d 523. As in Jhordan C., an unmarried woman had inseminated herself with a known donor's sperm. Although the court ultimately determined the statute was inapplicable because the mother had failed to comply with the physician involvement requirement, it further opined that the statute would violate due process if applied to the donor, because he and the mother, at the time of the procedure, had agreed there would be a relationship between the donor and the child. 64 Ohio Misc.2d at 12, 639 N.E.2d 523.
Since the Uniform Act was amended in 2000 to state simply, "A donor is not a parent of a child conceived by means of assisted reproduction," two of our sister states have decided three additional cases addressing statutes with identical or substantively indistinguishable provisions governing sperm donors and unmarried recipients. Steven S. v. Deborah D., 127 Cal.App.4th 319, 25 Cal. Rptr.3d 482 (2005); In re H.C.S., 219 S.W.3d 33 (Tex.App.2006); In re Sullivan, 157 S.W.3d 911 (Tex.App.2005).
Two of these cases come from Texas. They do not add much to the legal landscape with which we are concerned in this appeal because their outcomes were driven by standing, not an issue before us. See H.C.S., 219 S.W.3d 33 (known donor lacked standing to pursue parentage adjudication; child conceived through assisted reproduction by unmarried donor's sister's same-sex partner using donor's sperm); Sullivan, 157 S.W.3d 911 (known donor had standing to maintain paternity action; parties had signed preinsemination agreement stating donor would be treated as if he, mother were married).
*1038 The third case, Steven S., 127 Cal.App.4th 319, 25 Cal.Rptr.3d 482, from California, involved an unmarried woman and a known sperm donor who tried artificial insemination; when that resulted in a miscarriage, they attempted to conceive through sexual intercourse, also without success. Finally, a second artificial insemination attempt resulted in conception. The donor initially was very involved with the pregnancy and the child, and he filed a paternity action when the child was 3 years old.
The district court noted that California's statute presented a bar to paternity for unmarried sperm donors, but ruled in favor of the donor based on equitable estoppel. The donor was known; he had engaged in sexual intercourse with the unwed mother; and she had acknowledged him as the child's father and had allowed him to participate in the pregnancy and celebrate the birth of the child. The California Court of Appeals reversed, holding that the "words of [Cal. Fam. Code] section 7613, subdivision (b) are clear" and that, under such facts, "[t]here can be no paternity claim" because of the statute's absolute bar. Steven S., 127 Cal.App.4th at 326, 25 Cal.Rptr.3d 482.
None of these three decisions raised or reached the equal protection or due process challenges raised by the donor here.
Where does our Kansas statute fit into this landscape and its ongoing evolution?
In 1985, Kansas became one of the states that adopted portions of the Uniform Parentage Act of 1973 regarding presumptions of paternity, but it did not adopt any provision relating to artificial insemination. See L.1985, ch. 114, sec. 5 (H.B.2012).
In 1994, Kansas amended its statute to incorporate the 1973 Uniform Act's ง 5(b) as K.S.A. 38-1114(f). See L.1994, ch. 292, sec. 5 (Subst. H.B. 2583). It did not differentiate between known and unknown or anonymous donors, but it did make two notable changes in the uniform language.
As discussed above, although the 1973 Uniform Act governed the paternity of children born only to married women as a result of artificial insemination with donor sperm, the version adopted by Kansas omitted the word "married." See K.S.A. 38-1114(f). This drafting decision demonstrates the legislature's intent that the bar to donor paternity apply regardless of whether the recipient was married or unmarried.
The other alteration in the 1973 Uniform Act's language is directly at issue here. The Kansas Legislature provided that a sperm donor and recipient could choose to opt out of the donor paternity bar by written agreement. See K.S.A. 38-1114(f). The legislative record contains no explanation for this deviation from the 1973 Uniform Act's language. See Minutes of the House Judiciary Committee, January 19, 1994, and February 25, 1994.
This second drafting decision is critical and sets this case apart from all precedent. Our statute's allowance for a written agreement to grant a sperm donor parental rights and responsibilities means that, although we may concur with the McIntyre and C.O. courts in their constitutional analyses of absolute-bar statutes, we need not arrive at the same result. K.S.A. 38-1114(f) includes exactly the sort of escape clause the Oregon and Ohio courts found lackingโand unconstitutionalโin their statutes.
Ultimately, in view of the requirement that we accept as true D.H.'s evidence supporting existence of an oral agreement, we are faced with a very precise question: Does our statute's requirement that any opt-out agreement between an unmarried mother and a known sperm donor be "in writing" result in an equal protection or due process violation? Although several other states have adopted statutes like K.S.A. 38-1114(f), including language permitting an unmarried woman and a sperm donor to avoid the statutory bar and provide for the paternity of the donor through an "agreement in writing"โsee Ark. Code Ann. ง 9-10-201 (2002); Fla. Stat. ง 742.14 (2005); N.H.Rev.Stat. Ann. ง 168-B:3(I)(e) (2002); N.J. Stat. Ann. ง 9:17-44(b) (2002); N.M. Stat Ann. ง 40-11-6(B) (2006)โnone of the courts of these states has yet subjected such a statute to a constitutional crucible. We do so now, as K.S.A. 38-1114(f) is applied to D.H.
*1039 Equal Protection
K.S.A. 38-1114(f) draws a gender-based line between a necessarily female sperm recipient and a necessarily male sperm donor for an artificial insemination. By operation of the statute, the female is a potential parent or actual parent under all circumstances; by operation of the same statute, the male will never be a potential parent or actual parent unless there is a written agreement to that effect with the female. As discussed with counsel for the parties at oral argument before this court, the male's ability to insist on father status effectively disappears once he donates sperm. Until that point, he can unilaterally refuse to participate unless a written agreement on his terms exists. After donation, the male cannot force the fatherhood issue. The female can unilaterally decide if and when to use the donation for artificial insemination and can unilaterally deny any wish of the male for parental rights by refusing to enter into a written agreement.
The guiding principle of equal protection analysis is that similarly situated individuals should be treated alike. Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); State v. Limon, 280 Kan. 275, 283, 122 P.3d 22 (2005). In Kansas, as before the United States Supreme Court, statutory gender classifications such as this classification in K.S.A. 38-1114(f) are subject to intermediate, or heightened, scrutiny. Limon, 280 Kan. at 283-87, 122 P.3d 22; Chiles, 254 Kan. at 891-93, 869 P.2d 707; Farley, 241 Kan. at 669, 740 P.2d 1058; see Reed v. Reed, 404 U.S. 71, 76-77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In order to pass muster under the federal and state equal protection provisions, a classification that treats otherwise similarly situated individuals differently based solely on the individuals' genders must substantially further a legitimate legislative purpose; the government's objective must be important, and the classification substantially related to achievement of it. Nevada Dept. of Human Resources v. Hibbs, 538 U.S. 721, 729, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); Farley, 241 Kan. at 669, 740 P.2d 1058.
Given the biological differences between females and males and the immutable role those differences play in conceiving and bearing a child, regardless of whether conception is achieved through sexual intercourse or artificial insemination, we are skeptical that S.H. and D.H. are truly similarly situated. However, assuming for purposes of argument that they are, we perceive several legitimate legislative purposes or important governmental objectives underlying K.S.A. 38-1114(f).
As the McIntyre Court observed about the Oregon statute, K.S.A. 38-1114(f) envisions that both married and unmarried women may become parents without engaging in sexual intercourse, either because of personal choice or because a husband or partner is infertile, impotent, or ill. It encourages men who are able and willing to donate sperm to such women by protecting the men from later unwanted claims for support from the mothers or the children. It protects women recipients as well, preventing potential claims of donors to parental rights and responsibilities, in the absence of an agreement. Its requirement that any such agreement be in writing enhances predictability, clarity, and enforceability. Although the timing of entry into a written agreement is not set out explicitly, the design of the statute implicitly encourages early resolution of the elemental question of whether a donor will have parental rights. Effectively, the parties must decide whether they will enter into a written agreement before any donation is made, while there is still balanced bargaining power on both sides of the parenting equation.
In our view, the statute's gender classification substantially furthers and is thus substantially related to these legitimate legislative purposes and important governmental objectives. K.S.A. 38-1114(f) establishes the clear default positions of parties to artificial insemination. If these parties desire an arrangement different from the statutory norm, they are free to provide for it, as long as they do so in writing. Encouraging careful consideration of entry into parenthood is admirable. Avoidance of the limbo in which D.H. finds himself is a worthy legislative *1040 goal. We therefore hold that the application of K.S.A. 38-1114(f) to D.H. does not violate equal protection.
Due Process
Neither D.H. nor the Center explicitly addresses whether the due process challenge to K.S.A. 38-1114(f) in this case is based on procedural due process principles or substantive due process doctrine. Nor did the Oregon or Ohio courts that decided McIntyre and C.O. draw this distinction or comment upon it. See 98 Or.App. at 471-72, 780 P.2d 239;, 64 Ohio Misc.2d at 12, 639 N.E.2d 523. To the extent D.H.'s due process argument is couched in procedural language, i.e., that K.S.A. 38-1114(f)'s requirement of a writing, strictly interpreted, denies him "a meaningful opportunity to be heard" on the claim that there was, in fact, an oral agreement, we simply disagree. Indeed, for purposes of ruling on the propriety of the district judge's summary disposition in favor of S.H., we accept D.H.'s evidence that there was an oral agreement. Still, he has been denied no procedural right to which he was entitled; the statute merely sets up a burden of proof that his own inaction before donating his sperm left him unable to meet.
D.H.'s ignorance of the statute's requirement of a writing to record any agreement between him and S.H. as to his parental rights does not necessitate a ruling that the statute cannot be constitutionally applied to him. See Jhordan C. v. Mary K., 179 Cal. App.3d 386, 389, 224 Cal.Rptr. 530 (1986) (court analyzes applicability of artificial insemination statute despite parties' ignorance of it); see also Lehr v. Robertson, 463 U.S. 248, 264, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (failure to file with putative father registry out of ignorance of law insufficient reason to criticize law itself); State ex rel. Murray v. Palmgren, 231 Kan. 524, 536, 646 P.2d 1091 (1982) (ignorance of the law is no excuse). It is apparent to us that the only potentially meritorious due process argument before us focuses on the assertion of D.H.'s fundamental right to care, custody, and control of his children. This raises a substantive due process concern, rather than a problem over the absence of a specific procedural protection. Indeed, if anything, D.H. and the Center advocate for less rather than more formality in process; they regard the requirement of a writing to memorialize any agreement between a sperm donor and a recipient as so heavy a procedural burden that it tips the constitutional scales in favor of D.H. here.
In addition to relying on McIntyre and C.O., which, as previously discussed, addressed complete-bar statutes unlike our own, D.H. and the Center emphasize the United States Supreme Court's decision in Lehr. See 463 U.S. at 261, 103 S.Ct. 2985. Lehr's facts limit its utility here. As mentioned above, that case involved an unwed biological father petitioning to set aside an order of adoption based on his failure to be notified of the adoption proceedings. A New York statute guaranteed protection of any interest such a putative father could have in assuming a responsible role in the future of his child: The father in Lehr had failed to avail himself of this protection and had taken no other action that would have established a protectable interest in the child. While a state may not absolutely bar a biological parent from asserting parental rightsโthe proposition for which D.H. and the Center cite LehrโKansas has not done so. Even a sperm donor with no relationship to a child's mother can forge and protect his parental rights by insisting on a written agreement.
D.H. and the Center argue that D.H.'s other efforts to assert his entitlement to and intention to exercise parental rightsโstymied, they say, by S.H.โshould be enough. S.H., of course, casts D.H.'s behavior in a considerably less favorable light. Again, however, for purposes of review of the district judge's summary deposition in S.H.'s favor, we accept D.H.'s version of events. The infirmity in his substantive due process argument does not lie in those factual allegations for which he has provided evidence in the record, including his allegation of an oral agreement; the infirmity lies in the absence of any proof of an agreement with S.H. in writing.
We simply are not persuaded that the requirement of a writing transforms what is an otherwise constitutional statute into one *1041 that violates D.H.'s substantive due process rights. Although we agree with the Center that one goal of the Kansas Parentage Act as a whole is to encourage fathers to voluntarily acknowledge paternity and child support obligations, the obvious impact of the plain language of this particular provision in the Act is to prevent the creation of parental status where it is not desired or expected. To a certain extent, D.H. and the Center evidently misunderstand the statute's mechanism. It ensures no attachment of parental rights to sperm donors in the absence of a written agreement to the contrary; it does not cut off rights that have already arisen and attached.
We are confident this legislative design realizes the expectation of unknown or anonymous sperm donors, whether their motive for participation in artificial insemination is altruistic or financial. To the extent it does not realize the expectation of a known sperm donor, the statute tells him exactly how to opt out, how to become and remain a father. If, as the Center argues, genetic relationship must be destiny, then an anonymous donor with no intention to be a father would nevertheless automatically become one. It is evident to us the legislature chose an alternate arrangement. Neither D.H. nor the Center has convinced us there is a constitutional mandate for this court to make an independent policy choice.
We also reject the argument from D.H. and the Center that the statute inevitably makes the female the sole arbiter of whether a male can be a father to a child his sperm helps to conceive. This may be true, as we discussed above, once a donation is made, a recipient who becomes pregnant through artificial insemination using that donation can refuse to enter into an agreement to provide for donor paternity. This does not make the requirement of written agreement unconstitutional. Indeed, it is consistent with United States Supreme Court precedent making even a married pregnant woman the sole arbiter, regardless of her husband's wishes, of whether she continues a pregnancy to term. See Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 69-71, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). As discussed above, before a donation is made, a prospective donor has complete autonomy to refuse to facilitate an artificial insemination unless he gets an agreement in writing to his paternity terms. This is more than most fathers, wed or unwed to their children's mothers, can ever hope for. See Note and Comment, A Tale of Three Women: A Survey of the Rights and Responsibilities of Unmarried Women Who Conceive by Alternative Insemination And A Model for Legislative Reform, 19 Am. J.L. & Med. 285, 304 (1993) (absence of executed writing evidence donor failed to, in words of Lehr, "grasp opportunity" to parent; chance to condition donation upon execution of agreement puts donor in control). The requirement that a sperm donor's and recipient's agreement be in writing does not violate D.H.'s due process rights.
All of this being said, we cannot close our discussion of the constitutionality of K.S.A. 38-1114(f) without observing that all that is constitutional is not necessarily wise. We are mindful of, and moved by, the Center's advocacy for public policy to maximize the chance of the availability of two parents โ and two parents' resources โ to Kansas children. We are also aware of continued evolution in regulation of artificial insemination in this and other countries. In particular, Britain and The Netherlands now ban anonymous sperm donations, near-perfect analogs to donations from known donors who will have no role beyond facilitating artificial insemination. These shifts formally recognize the understandable desires of at least some children conceived through artificial insemination to know the males from whom they have received half of their genes. The Human Fertilization and Embryology Authority Act of 1990, as amended by Disclosure of Donor Information, Regulations 2004 No. 1511 (requiring, effective April 2005, British donors' identities to be made available to donor-conceived children when children become 18); Netherlands Embryos Bill, Article 3 Dutch Ministry of Health, Welfare, and Sport (2004) www.minvws.nl/en (effective June 2004, child born using donated sperm have right to obtain information about biological father at age 16). As one such child recently wrote,

*1042 "[t]hose of us created with donated sperm won't stay bubbly babies forever. We're all going to grow into adults, and form opinions about the decision to bring us into the world in a way that deprives us of the basic right to know where we came from, what our history is and who both our parents are."
Clark, My Father was an Anonymous Sperm Donor, The Washington Post, December 17, 2006, at B01 (also currently available at http://www.washingtonpost.com/wp-dyn/ content/article/2006/12/15/AR2006121501820.html). We sympathize. However, weighing of the interests of all involved in these procedures as well as the public policies that are furthered by favoring one or another in certain circumstances, is the charge of the Kansas Legislature, not of this court.

"Provided to a Licensed Physician"
D.H.'s next argument on appeal is that the district judge erred in applying K.S.A. 38-1114(f) to him because his sperm was not "provided to a licensed physician," as required by the statute. Instead, it was provided to S.H., who, in turn, provided it to the medical personnel who performed the insemination.
D.H. opens this argument by citing a Kansas Court of Appeals case involving a petition to terminate the rights of a putative father for the proposition that "[s]tatutes pertaining to adoption, relinquishment, or termination of parental rights are strictly construed as they affect a parent's liberty interest in the custody and control of his or her children." In re J.A.C., 22 Kan.App.2d 96, Syl. ถ 3, 911 P.2d 825 (1996). This case has no influence on our de novo standard of review here. As discussed at length with regard to the constitutionality of K.S.A. 38-1114(f), absent a written agreement to the contrary, D.H. is not a putative father. He is a sperm donor only. His link to the twins is purely, and solely, biological. It does not give rise to a constitutionally protected right. See Lehr, 463 U.S. at 261, 103 S.Ct. 2985.
When we are called upon to interpret a statute, we first attempt to give effect to the intent of the legislature as expressed through the language enacted. When a statute is plain and unambiguous, we do not speculate as to the legislative intent behind it and will not read the statute to add something not readily found in it. We need not resort to statutory construction. It is only if the statute's language or text is unclear or ambiguous that we move to the next analytical step, applying canons of construction or relying on legislative history construing the statute to effect the legislature's intent. See CPI Qualified Plan Consultants, Inc. v. Kansas Dept. of Human Resources, 272 Kan. 1288, 1296, 38 P.3d 666 (2002); State v. Robinson, 281 Kan. 538, 539-40, 132 P.3d 934 (2006).
Again, K.S.A 38-1114(f) states in pertinent part: "The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the birth father of a child. . . ." D.H.'s argument focuses on the phrase "provided to licensed physician," essentially reading it to say "directly and personally provided to a licensed physician" or "provided to a licensed physician by the donor." This argument lacks merit.
The language of the statute is clear and unambiguous, and we will not add to it, as D.H. suggests. The words "the donor" form the subject of the predicate "is treated as if he were not the birth father." The lengthy dependent clause "provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife" modifies "semen." K.S.A. 38-1114(f) does not require the donor himself to provide his sperm to the physician performing the insemination. It requires only that the donor's sperm be provided to the physician by an unspecified someone or something. The fact that S.H. was that someone here did not prevent application of the statute to this situation.

"Unless Agreed to in Writing"
Assuming arguendo the constitutionality and applicability of K.S.A. 38-1114(f), D.H. next argues that the statute's requirement of a written agreement should be *1043 deemed satisfied by the CINC petition filed by S.H. or by the CINC petition and his paternity petition, read together. He asserts that the statute sets forth no requirement that a written agreement be entered into at or before the time of the insemination and points out that the CINC petition referred to him "56 times" as the twins' "father." S.H. argues that there was no "meeting of the minds" between her and D.H. regarding coparenting and that the pleadings evidence none.
There is no technical definition of "agreed to" or "writing" in the Kansas Parentage Act of which K.S.A. 38-1114(f) is a part. Although these words or forms of them are defined elsewhere in Kansas statutes, see, e.g., K.S.A.2006 Supp. 84-1-201(3) (defining "agreement" as used in Kansas version of Uniform Commercial Code); K.S.A.2006 Supp. 84-1-201(46) (defining "written," "writing" as used in same), these definitions, by their terms, are inapplicable. We therefore give these words as used in K.S.A. 38-1114(f) the meaning accorded them in everyday English. See GT, Kansas, L.L.C. v. Riley County Register of Deeds, 271 Kan. 311, 316, 22 P.3d 600 (2001).
When we do so, there can be no doubt that the pleadings filed by the parties are "in writing." However, interpreting them separately or together to prove the parties "agreed to" D.H.'s status as a father would require Lewis Carroll's looking glass. The absence of such an agreement necessitated the drafting and filing of the pleadings in the first place. Their existence and substance do not memorialize accord, rather, its opposite. A CINC petition to terminate D.H.'s parental rights under K.S.A. 38-1531 may have been an odd procedural vehicle for effecting S.H.'s desire โ a court order stating that D.H. never acquired any parental rights under K.S.A. 38-1114(f). A declaratory judgment action might have been better suited to her legal position. But she and her counsel were in uncharted waters. We will not hold that the pleadings constitute a written agreement by operation of law.

Parental Rights Under K.S.A. 38-1114(a)(4)
In the final paragraphs of his brief on appeal, D.H. argues that this case should be controlled by K.S.A. 38-1114(a)(4) rather than K.S.A. 38-1114(f). K.S.A. 38-1114(a)(4) provides:
"(a) A man is presumed to be the father of a child if:
. . . .
"(4) The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made [by amendment of birth certificate] in accordance with K.S.A. 38-1130 or [filing of birth certificate under K.S.A.] 65-2409a, and amendments thereto."
In his brief before the district court, D.H. attempted to reserve "the right to make claims based on ratification, estoppel, and common law," but this specific contention under K.S.A. 38-1114(a)(4) was never raised below. Nevertheless, given the status of this case as one of first impression and the potential for denial of fundamental rights, see In re M.M.L., 258 Kan. 254, 261, 900 P.2d 813 (1995), we address its merit.
A specific statute controls over a general statute. See State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City, 264 Kan. 293, 311, 955 P.2d 1136 (1998). Likewise, a specific provision within a statute controls over a more general provision within the statute. K.S.A. 38-1114(f) is far more specific to cases involving artificial insemination by a sperm donor such as D.H. than the general presumption of paternity set out in K.S.A. 38-1114(a)(4). D.H.'s claim under K.S.A. 38-1114(a)(4) is without merit.

Equity
For the first time in his appellate reply brief, D.H. asserts that the district court must be reversed because S.H. has "unclean hands." In essence, he argues that he, a nonlawyer, was tricked by lawyer S.H., who failed to inform him of the statute and failed to explain how the absence of independent legal advice or a written agreement could affect his legal rights. He asserts that he asked S.H. about whether he needed a lawyer or whether they should put their arrangement in writing and was told neither was necessary. This behavior, he alleges, *1044 may have constituted a violation of S.H.'s ethical duties as a licensed lawyer.
Despite D.H.'s attempt in his district court brief to reserve "the right to make claims based on ratification, estoppel, and common law," this invocation of equity was never further preserved for review by pursuit in the district court or by inclusion in his opening appellate brief. See McGinley v. Bank of America, N.A., 279 Kan. 426, 444, 109 P.3d 1146 (2005) (issue not briefed by appellant deemed waived, abandoned); Titterington v. Brooke Insurance, 277 Kan. 888, Syl. ถ 3, 89 P.3d 643 (2004) ("[a] point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned"); Board of Lincoln County Comm'rs v. Nielander, 275 Kan. 257, 268, 62 P.3d 247 (2003) (issue not raised in district court not preserved for appellate court). Even if we would nonetheless be inclined to reach its merit, given the posture of the case and the fundamental nature of the rights in play, we also are prevented from doing so by an inadequate appellate record of the underlying facts. See State ex rel. Stovall v. Alivio, 275 Kan. 169, 172, 61 P.3d 687 (2003) (duty of party to furnish appellate record sufficient to enable review of issue). D.H. never proffered evidence to support his assertions of nefarious conduct by S.H. The evidence he presented to the district court focused only on the existence of an oral agreement and his efforts at support; even assuming all of this evidence to be true, it is insufficient under what we have held is a constitutional statute.
Generally speaking, mere ignorance of the law is no excuse for failing to abide by it. State ex rel. Murray v. Palmgren, 231 Kan. 524, 536, 646 P.2d 1091 (1982). There may be a case in the future in which a donor can prove that the existence of K.S.A. 38-1114(f) was concealed, or that he was fraudulently induced not to obtain independent legal advice or not to enter into a written agreement to ensure creation and preservation of his parental rights to a child conceived through artificial insemination. This is not such a case.
Affirmed.
ALLEGRUCCI, NUSS, LUCKERT, and ROSEN, JJ, not participating.
LOCKETT, J., Retired, CAPLINGER and HILL, JJ, assigned.[1]
McFARLAND, C.J., concurring:
I agree with the majority's conclusion that K.S.A. 38-1114(f) is constitutionally permissible and operates to bar D.H. from asserting parental rights relative to the twins K.M.H. and K.C.H.
I think it is helpful to consider subsection (f) in context with other provisions of K.S.A. 38-1114. The statute is lengthy and states the presumptions of paternity in various factual situations. Illustrative thereof is the following excerpt:
"(a) A man is presumed to be the father of a child if:
"(1) The man and the child's mother are, or have been, married to each other and the child is born during the marriage or within 300 days after the marriage is terminated by death or by the filing of a journal entry of a decree of annulment or divorce.
"(2) Before the child's birth, the man and the child's mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is void or voidable and:
(A) If the attempted marriage is voidable, the child is born during the attempted marriage or within 300 days after its termination by death or by the filing of a journal entry of a decree of annulment or divorce; or
(B) if the attempted marriage is void, the child is born within 300 days after the termination of cohabitation.

*1045 "(3) After the child's birth, the man and the child's mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is void or voidable and:
(A) The man has acknowledged paternity of the child in writing;
(B) with the man's consent, the man is named as the child's father on the child's birth certificate; or
(C) the man is obligated to support the child under a written voluntary promise or by a court order.
"(4) The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made in accordance with K.S.A. 38-1130 or 65-2409a, and amendments thereto.
"(5) Genetic test results indicate a probability of 97% or greater that the man is the father of the child." K.S.A. 38-1114(a).
The statute further provides:
"(b) A presumption under this section may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man or as provided in subsection (c). If a presumption is rebutted, the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence.
. . . .
"(e) If a presumption arises under this section, the presumption shall be sufficient basis for entry of an order requiring the man to support the child without further paternity proceedings." K.S.A. 38-1114(b), (e).
The bulk of the statute is concerned with establishing presumptions as to the paternity of a child. These are presumptions that may be rebutted. Subsection (f) is the final provision of that statute and is in stark contrast to the rest of the statute. No presumption is involved therein. Subsection (f) states:
"(f) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the birth father of a child thereby conceived, unless agreed to in writing by the donor and the woman." K.S.A. 38-1114(f).
The biological father of a child conceived under the circumstance described therein is to be treated in law as not being the birth father, absent an agreement in writing.
To come under the statute, an unmarried woman must desire to be impregnated by artificial insemination in a procedure by a licensed physician. She could elect to have an anonymous donor from a sperm bank. The statute would bar the donor from the rights of parentage even if his identity were later determined. If the woman elects to ask an acquaintance to be the donor and he agrees, he has no parentage rights unless the parties agree thereto in writing. If the parties agree in writing, the donor is assuming not only the privileges associated with parenthood but the possible financial burden of child support for 18 years or so. The man might feel flattered to be asked to be the donor and even be assured no child support would ever be sought. Without the statute, the donor would likely have no defense to child support claims asserted by the mother or the child.
Under the statute, absent an agreement in writing, the prospective mother would truly become a single parent upon a successful pregnancy, having assumed all parental privileges, duties, and obligations to any child born as a result of the artificial insemination. If the donor she sought out wants to assume parental privileges and responsibilities, and the prospective mother does not want this and will not agree, the would-be donor can say no deal and walk away. There is no child and no issue as to future rights and/or duties of the would-be donor. The prospective mother can seek out a sperm bank, another artificial insemination donor, proceed in some other manner outside the subsection, or abandon the idea of pregnancy. The subsection (f) provision appears to be aimed at protecting both parties from unwanted duties and/or obligations being imposed without their consent in the very limited factual situation to which it applies.
*1046 Further, as the majority notes, it is not ruling out the possibility that some future factual situation might result in the statutory bar being held inapplicable under those specific facts.
CAPLINGER, J., dissenting:
I respectfully disagree with the majority's analysis of the constitutionality of K.S.A. 38-1114(f) as applied to D.H. I would hold the statute unconstitutional as applied to D.H. for the reason that it violates his fundamental right to parent his children without due process of law.
In reaching its conclusion that K.S.A. 38-1114(f) comports with due process, the majority analyzes at least two extra-jurisdictional cases which hold that statutes creating an absolute bar to donor paternity violate due process rights as applied to a known donor: McIntyre v. Crouch, 98 Or.App. 462, 780 P.2d 239 (1989), cert. denied 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). (Oregon statute's absolute bar to paternity violated due process as applied to known sperm donor if donor could establish on remand that he and child's mother agreed that donor would be the natural father of the child); and C.O. v. W.S., 64 Ohio Misc.2d 9, 639 N.E.2d 523 (1994) (Ohio statute's absolute bar to paternity of known donor violated due process as applied to donor where mother solicited participation of donor and agreed that known donor would have relationship with child).
Significantly, the majority concurs with "the McIntyre and C.O. courts in their constitutional analyses of absolute bar statutes." Op. at 34. Nevertheless, the majority concludes it need not arrive at the same result because "K.S.A. 38-1114(f) provides exactly the sort of escape clause the Oregon and Ohio courts found lacking โ and unconstitutional โ in their statutes." Op. at 34.
I agree with the majority's conclusion that "absolute bar" statutes like those at issue in McIntyre and C.O. violate due process. I do not agree, however, that the K.S.A. 38-1114(f) provision permitting a donor to "opt out" of the statute's paternity bar saved the statute's constitutionality under the facts of this case.
The statutory provision at issue here bears repetition at this juncture. K.S.A. 38-1114(f) provides:
"The donor of semen provided to a licenced physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the birth father of a child thereby conceived, unless agreed to in writing by the donor and the woman." (Emphasis added.)
Before discussing the specific basis for my disagreement with the majority's conclusion that the italicized proviso renders the statute constitutional as applied to D.H., I would first note that neither the McIntyre court nor the C.O. court found, as the majority suggests, that their respective state statutes were unconstitutional because they lacked an "escape clause" providing for a written agreement between the parties.
The court in McIntyre found the applicable statute problematic because it barred the petitioner from the rights and responsibilities of fatherhood "even if respondent had agreed with [the donor that he would have parental rights] before he gave her his semen in reliance on that agreement." 98 Or.App. at 468, 780 P.2d 239. The court noted the statute contained no qualifying language and, in a footnote, compared a Washington state statute which contained a written opt-out provision similar to that found in K.S.A. 38-1114(f). 98 Or.App. at 468 n. 2, 780 P.2d 239; see also In Interest of R.C., 775 P.2d 27, 33 n. 7 (Colo.1989) (recognizing in footnote that "[a] growing number of legislatures have sought to clear up this confusion by enacting laws that extinguish parental rights of semen donors unless the donor acknowledges his paternity in writing"). The court in McIntyre, however, did not determine whether the addition of an opt-out provision like that at issue here would have resolved its due process concerns.
Moreover, while the court in C.O. did point out that a statute that "absolutely extinguishes a father's efforts to assert the rights and responsibilities of being a father . . . runs contrary to due process standards," it did not compare any statutes containing a written opt-out provision. Further, it found its own statute lacking because it did not take into *1047 account the parties' oral agreement that the donor would have a relationship with any child conceived of the insemination. 64 Ohio Misc.2d at 12, 639 N.E.2d 523. The court in C.O. did not, as the majority suggests, indicate that a written opt-out agreement would have ameliorated the court's due process concerns.
In fact, the expansive rationale in C.O. suggests otherwise:
"Public policy supports the concept of legitimacy, and the concomitant rights of a child to support and inheritance. [Citation omitted.] A father's voluntary assumption of fiscal responsibility for his child should be endorsed as a socially responsible action." 64 Ohio Misc.2d at 12, 639 N.E.2d 523.
Thus, while the courts in C.O. and McIntyre suggested that it was their respective statute's "absolute bar" that ran afoul of due process safeguards, neither court held that a requirement permitting the parties to opt out of the statute, so long as the agreement was memorialized in writing, would satisfy due process safeguards. As the majority recognizes, no court has considered the specific issue facing this court.
For the reasons discussed below, I would find that K.S.A. 38-1114(f)'s inclusion of a written "opt-out" provision does not save it from the same fate as the statutes considered by the courts in McIntyre and C.O. โ i.e., it is unconstitutional because it violates due process as applied to the donor.
Requirement that donor take affirmative action to protect his parental rights
In concluding that the opt-out provision in K.S.A. 38-1114(f) satisfies due process requirements, the majority states that D.H.'s "own inaction before donating his sperm" left him unable to meet the statute's requirements of a written agreement. Op. at 38. (Emphasis added.) Therein lies the constitutional problem with the statute. Fundamental rights must be actively waived, rather than passively lost due to inaction.
Initially, before analyzing this issue, I would note that the terminology employed by the majority, i.e., that D.H. failed to "opt out" of the statute, is a misnomer. In effect, the statute requires a known sperm donor, regardless of any agreement or understanding the donor may have as to his role in parenting a child conceived from his sperm, to opt in to parenthood or forever waive his right to parent. As discussed below, under the circumstances of this case, the statute's requirement that D.H. take affirmative action to preserve his fundamental right to parent, or to "opt in" to parenting, violates fundamental principles of due process.
Pursuant to the Fourteenth Amendment to the United States Constitution, no State shall "deprive any person of life, liberty, or property, without the due process of law." The Supreme Court has held that the Fourteenth Amendment "guarantees more than fair process" and "includes a substantive component that `provides heightened protection against government interference with certain fundamental rights and liberty interests.' [Citation omitted.]" Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). It is well established that the right to parent is a fundamental right protected by the United States Constitution. See, e.g., Troxel, 530 U.S. at 65-66, 120 S.Ct. 2054; Stanley v. Illinois, 405 U.S. 645, 651-52, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
The Supreme Court has further consistently held that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege" and thus must result from a free and conscious choice. 304 U.S. at 464, 58 S.Ct. 1019. And, when faced with a waiver of a fundamental right, courts "do not presume acquiescence in the loss of fundamental rights." 304 U.S. at 464, 58 S.Ct. 1019; see also Hodges v. Easton, 106 U.S. (16 Otto) 408, 412, 1 S.Ct. 307, 27 L.Ed. 169 (1882) (right to trial by jury in a civil case is a fundamental right and every reasonable presumption must be indulged against its waiver).
The majority recognizes that K.S.A. 38-1114(f) permits a donor to waive his right to parent simply by his own inaction rather *1048 than through an intentional act relinquishing that right. For this reason, I would find the statute's "escape clause" does not satisfy due process requirements.
Effect of "ignorance of the law" on an individual's fundamental right to parent
Nor can I agree with the majority's conclusion that D.H.'s ignorance of the statute's writing requirement has no effect on the statute's application. Op. at 38. In support of this determination, the majority essentially reiterates the often-stated principle that "ignorance of the law is no excuse," and cites three cases in support of its application of this principle to the facts here: Lehr v. Robertson, 463 U.S. 248, 264, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Jhordan C. v. Mary K., 179 Cal.App.3d 386, 389, 224 Cal.Rptr. 530 (1986); and State ex rel. Murray v. Palmgren, 231 Kan. 524, 536, 646 P.2d 1091 (1982). However, none of these cases hold that an individual can relinquish a fundamental right simply through ignorance of the law.
As the majority notes, the Kansas Supreme Court held in Murray, 231 Kan. at 536, 646 P.2d 1091, that "[i]gnorance of the law is no excuse." Further, the court referred to the "impressive body of authority and the ancient maxim" supporting this statement. 231 Kan. at 536, 646 P.2d 1091. However, the question before the court in Murray was not whether an individual may waive a fundamental right by ignorance of a law requiring affirmative action to protect that right. Rather, the question in Murray was whether the meetings conducted by the board of trustees of a county hospital were covered by the Kansas Open Meetings Act, in light of the board members' claim that any violation of the Act was in "good faith" because they had been advised by the county attorney that their meetings were not covered by the Act. I simply cannot equate such "ignorance," and the effect of such ignorance, with a father's preconception waiver of his right to parent a child because of his ignorance of a statute requiring him to "opt in" to parenting.
Jhordan C., 179 Cal.App.3d 386, 224 Cal. Rptr. 530, also cited by the majority, is unpersuasive for the obvious reason that it is not precedential authority. More importantly, while the majority cites Jhordan C. in support of its statement that D.H.'s ignorance of our Kansas statute does not preclude its application here, the court in Jhordan made no determination whatsoever as to whether a donor's ignorance of a California statute would suffice to waive his fundamental right to parent. Instead, the Jhordan C. court merely noted in reciting the factual background that the parties were "completely unaware of the existence" of the statute. 179 Cal.App.3d at 389, 224 Cal.Rptr. 530. Moreover, the court in Jhordan C. ultimately concluded California's statute could not bar the donor's rights because the donor's sperm had not been provided to a licensed physician. 179 Cal.App.3d at 397-98, 224 Cal. Rptr. 530.
The third case cited by the majority in support of its conclusion that the donor's "ignorance of the law is no excuse," is Lehr, 463 U.S. at 264, 103 S.Ct. 2985. There, the United States Supreme Court considered whether a biological father should receive notice of adoption when that father never established a relationship with his child and further failed to comply with a New York law requiring him to file notice with a putative father registry. The Court recognized that familial relationships are "an interest in liberty entitled to constitutional protection" and state statutes that take away this right must comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 463 U.S. at 258, 103 S.Ct. 2985.
As the majority points out, the Lehr Court held that the putative father's ignorance of the requirement that he must mail a postcard to the putative father registry to guarantee his right to receive notice of the adoption proceedings of his daughter, was not a "sufficient reason to criticize the law itself." 463 U.S. at 264, 103 S.Ct. 2985.
However, the majority's focus on this aspect of the Lehr decision is misplaced in light of Lehr's recognition and characterization of a father's fundamental rights to parent.
The Lehr Court noted it was not concerned with whether the father had a significant *1049 relationship with his biological daughter but, instead, was focused on whether New York protected his opportunity as a father to form that relationship. 463 U.S. at 262, 103 S.Ct. 2985. The Court examined New York's putative father registry and found that because the biological father retained the control to receive notice of adoption proceedings, the Due Process Clause was not violated. 463 U.S. at 264, 103 S.Ct. 2985.
In so ruling, the Court noted that the impetus for New York's putative father registry was the holding in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, where the Supreme Court struck down a statute that automatically classified any man who fathered a child out of wedlock as an unfit parent. The Court in Lehr further noted that a special committee charged by the New York Legislature with forming the law after Stanley was supposed to "accommodate both the interests of the biological fathers in their children and the children's interests in prompt and certain adoption procedures." 463 U.S. at 263, 103 S.Ct. 2985.
Thus, when considering Lehr and its application here, it is vital to remember the Court upheld a statute that terminated the parental rights of a biological father, but it did so in the context of a pending adoption proceeding. Because a nonbiological father figure was ready, willing, and able to assume the responsibilities of parenthood, the Lehr Court found no reason to delay the child's adoption simply because the previously absentee biological father suddenly asserted rights, yet failed to take the steps necessary โ as provided by a statute โ to preserve those rights. 463 U.S. at 265-66, 103 S.Ct. 2985.
Placed in context, the Lehr Court's affirmance of the termination of the biological father's parental rights makes sense, and the Court's observation that "`[p]arental rights do not spring full-blown from the biological connection between parent and child'" is merited. 463 U.S. at 260, 103 S.Ct. 2985 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 60 L.Ed.2d 297, 99 S.Ct. 1760 [1979] [Stewart, J., dissenting] [ruling that the adoption of two children by their stepfather would violate the Equal Protection rights of the biological father, who had constantly been involved with the lives of the children]).
Here, however, we are not faced with a situation in which an additional party seeks to assert parental rights; instead, only the biological father seeks to assert his rights to parent his children. Thus, the need for a determination of parental rights does not exist in the same urgency that it exists in an adoption situation where all parties involved, particularly the child, are best served with clear laws and a certain ruling.
I would urge the majority to consider the complete rationale of Lehr: "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the Due Process Clause." 463 U.S. at 261, 103 S.Ct. 2985 (quoting Caban, 441 U.S. at 392, 99 S.Ct. 1760).
That is the scenario with which this court is faced. A putative father has come forward to participate in the rearing of his children, emotionally and financially; consequently, his interest in doing so is entitled to full protection under the Due Process Clause. Instead of being given this protection and an opportunity to prove that he intended to actively parent his children, D.H. has been subjected to the workings of a statute of which he was unaware, that required him to "opt in" to fatherhood before ever donating his sperm, or be forever barred from parenting his children.
I strongly disagree with the majority's conclusion that D.H.'s own inaction, whether due to ignorance of the law or otherwise, constituted a waiver of his rights to parent. Because the rights to parent are fundamental, those rights may be waived only through an intentional, free, and meaningful choice. Here, the record indicates D.H. was not even aware of K.S.A. 38-1114(f), much less its requirement that he must enter into a written agreement formalizing his intent to parent his child before he provided his sperm to S.H. I would find the statute's requirement that a known sperm donor affirmatively take action to preserve his fundamental rights to *1050 parent constituted a violation of due process as applied to D.H.
The State's interest in furthering predictability, clarity, and enforceability
The majority declares that the K.S.A. 38-1114(f) requirement that any agreement regarding parenting be in writing "enhances predictability, clarity, and enforceability." Op. at 37. Further, it suggests that "avoidance of the limbo in which D.H. finds himself in is a worthy legislative goal." Op. at 37.
"Clarity," while an admirable goal, has little do with the constitutionality of this statute. Significantly, in Stanley, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, the United States Supreme Court addressed the allegations of clarity and administrative convenience as justifications for a purported violation of the Due Process Clause. There, an unwed father challenged an Illinois statute which resulted in his classification as an unfit father and the removal of his children from their home after the death of the mother because he had not been married to the children's mother. The State argued it was unnecessary to hold individualized hearings to determine the fitness of unwed fathers before those fathers were separated from their children because unmarried fathers were "per se" unfit.
The Supreme Court disagreed and ruled in accordance with the Due Process Clause that Stanley was entitled to a fitness hearing before his children were taken from him. 405 U.S. at 649, 92 S.Ct. 1208. The Court specifically addressed the argument that individualized hearings for unmarried fathers would create an administrative inconvenience and noted that although the State has an interest in prompt procedures, "the Constitution recognizes higher values than speed and efficiency." 405 U.S. at 656, 92 S.Ct. 1208.
Thus, even though K.S.A. 38-1114(f) may provide a quick and clear method to dismiss paternity actions, it must comport with the values inherent in the Constitution, namely due process of law.
The Court in Stanley pointed out that prompt procedures are not the only consideration important to citizens:
"Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." 405 U.S. at 656-57, 92 S.Ct. 1208.
Kansas law provides a presumption that sperm donors are not the legal parents of any children conceived of the donated sperm, absent a written agreement. In the case of a known sperm donor and an unmarried woman, however, the donor should be allowed the opportunity for a hearing to establish his intent to be something other than a sperm "donor" โ i.e., to establish his paternity and rights as a parent. Simply stated, I would find the statute's clarity does not justify its constitutional violation.
The requirement of a "writing" under K.S.A. 38-1114(f)
It is interesting to note that in considering whether the K.S.A. 38-1114(f) writing requirement may be met by considering S.H.'s averments in her pleadings, the majority references Lewis Carroll's "looking glass." Op. at 47. ("[I]nterpreting [pleadings] separately or together to prove the parties `agreed' to D.H.'s status as a father would require Lewis Carroll's looking glass."). While I agree with the majority that we cannot interpret the pleadings filed by S.H. (in which she referred to D.H. as the "father" of her children at least 56 times) as the "writing" contemplated by K.S.A. 38-1114(f), I would find that S.H.'s inconsistent pleadings and actions are evidence to be considered by the district court in determining whether the parties agreed that D.H. would play an active role in the twins' life.
S.H. filed a child in need of care (CINC) petition the day following the twins' birth seeking to terminate D.H.'s parental rights. In the petition, she alleged several reasons for terminating D.H.'s parental rights, including D.H.'s failure to provide prenatal emotional and financial support, which implied she intended D.H. to play a role in the *1051 parenting process. Significantly, no mention was made in the CINC petition of K.S.A. 38-1114(f) or its potential application here. In fact, it was not until petitioner filed an amended petition more than 2 weeks after the initial petition that mention was made of K.S.A. 38-1114(f) and its presumption of nonpaternity.
Thus, I would remand for the district court to consider all evidence relevant to the existence of an agreement between the parties, including S.H.'s inconsistent allegations regarding D.H.'s responsibilities, her consistent reference to D.H. as the "father" of her children, and her failure to rely upon the statutory presumption in her initial petition.
As a final note, I agree that this court should not place fathers in an "Alice and Wonderland" scenario where the rules of the "chess game" are constantly changing and Kansas children are sometimes left without two supportive parents. And yet, it seems to me that rather than Lewis Carroll's looking glass, we are looking at this case through a "funny mirror" at the local carnival. It is apparent that D.H. seeks to be a loving and supportive parent to the two children he has biologically fathered-two children who have no other putative father. And yet, by operation of a statute of which D.H. was unaware, his rights to parent these children were cut off before the children were conceived with the use of his sperm. This is a result we should not abide for D.H. or for his children absent the protections of due process.
Conclusion
I would hold K.S.A. 38-1114(f) unconstitutional as applied to D.H. as it takes away his fundamental rights to parent his children without due process of law. Further, I would remand this case with directions to the district court to resolve the factual dispute recognized by the majority here โ i.e., whether D.H. and S.H. agreed that D.H. would be the natural father of K.C.H. and K.M.H. If the court concludes that such an agreement existed, then it must hold that K.S.A. 38-1114(f) did not apply to extinguish D.H.'s rights and must proceed to determine paternity and the extent to which D.H. will be permitted to share the rights and responsibilities of parenting his two children.
HILL, J., dissenting:
I must respectfully join with Judge Caplinger in her dissent. I too agree that as applied in this case, K.S.A. 38-1114(f) is unconstitutional when applied to a known donor.
But I raise my hand and ask a different question. Who speaks for the children in these proceedings? As applied by the majority in this case, this generative statute of frauds slices away half of their heritage. A man who was once considered a "putative father" in the initial child in need of care proceeding is now branded a mere "semen donor." The majority offers the children sympathy. But is this in their best interests? The trial court never got to the point of deciding the best interests of the children because it was convinced that such a consideration was barred by the operation of K.S.A. 38-1114(f) to a known donor.
None of the elaborate and meticulous safeguards our Kansas laws afford parents and children in proceedings before our courts when confronted with questions of parentage have been extended to these children. A quick glance over our procedures dealing with the Kansas Parentage Act (K.S.A. 38-1110 et seq.) or our Code for Care of Children (K.S.A. 38-1501 et seq.) reveals the great caution we take in this state when courts must consider such relationships. While it is true that an attorney was appointed to represent the children in the original child in need of care case, the record from their point of view remains silent. Instead only the voices of mother and "semen donor" are heard in district court and this court as well.
I agree with the Ohio Court of Common Pleas when it said:
"A father's voluntary assumption of fiscal responsibility for his child should be endorsed as a socially responsible action. A statute which absolutely extinguishes a father's efforts to assert the rights and responsibility of being a father, in a case with such facts as those sub judice, runs contrary to due process safeguards. [Citation *1052 omitted.]" C.O. v. W.S., 64 Ohio Misc.2d 9, 12, 639 N.E.2d 523 (1994) (citing Lehr v. Robertson, 463 U.S. 248, 77 L.Ed.2d 614, 103 S.Ct. 2985 [1983]).
I think the same can be said about our statute.
NOTES
[1] REPORTER'S NOTE: Justice Tyler C. Lockett, Retired, was appointed to hear case No. 96,102 vice Justice Allegrucci pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616. Judge Nancy L. Caplinger and Judge Stephen D. Hill, of the Kansas Court of Appeals, were appointed to hear case No. 96,102 vice Justices Luckert and Rosen respectively pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).